<p style="text-align:center; color:red;">**PUBLIC VERSION**</p>

## UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Northwest Rural Public Power District | ) | |
| Complaint | ) | |
| | ) | Docket No. EL24-___-000 |
| v. | ) | |
| | ) | |
| Basin Electric Power Cooperative | ) | |
| and | ) | |
| | ) | |
| Tri-State Generation and Transmission | ) | |
| Association, Inc. | ) | |
| | ) | |
| Respondents | ) | |

## SECTION 206 COMPLAINT AND REQUEST FOR FAST TRACK PROCESSING OF NORTHWEST RURAL PUBLIC POWER DISTRICT

Chance Briscoe
Northwest Rural Public Power District
5613 State Highway 87
Hay Springs, NE 69347
(308) 638-4445
cbriscoe@nrppd.com

Richard M. Lorenzo
J.D. Taliaferro
Nicole A. Travers
Loeb & Loeb LLP
901 New York Avenue NW
Suite 300E
Washington, DC 20001
(202) 618-5000
rlorenzo@loeb.com
jtaliaferro@loeb.com
ntravers@loeb.com

*Attorneys for Northwest Rural Public Power District*

**EXHIBIT 3**

# Table of Contents

I.      COMMUNICATIONS ....................................................................................4

II.     INTRODUCTION .........................................................................................5

        A.      The Parties: ........................................................................................5

                1.      Northwest Rural Public Power District: ..................................5

                2.      Basin Electric Cooperative: .....................................................5

                3.      Tri-State Generation and Transmission Association, Inc.: .........6

III.    FACTUAL BACKGROUND .........................................................................6

        A.      The Basin-Tri-State-NRPPD Relationship ............................................6

        B.      The Eastern Interconnection WPC .......................................................8

        C.      The Tri-State CTP Methodology Proceeding Before FERC ...............10

        D.      Basin Proceedings before the District Court .......................................12

                1.      Basin I Complaint ...................................................................12

                2.      Basin II Complaint ..................................................................15

IV.     ARGUMENT ...............................................................................................16

        A.      The Commission Has Primary Jurisdiction over the Eastern
                Interconnection WPC and Should Interpret Its Terms ........................16

                1.      The Eastern Interconnection WPC is a Filed Rate before the
                        FERC ......................................................................................16

                2.      The Basin I Court Deferred Primary Jurisdiction of Basin's
                        Claim to FERC .......................................................................17

                3.      The Eastern Interconnection WPC is Jurisdictional under the
                        Arkla Standard. ......................................................................18

        B.      The Eastern Interconnection WPC Is An All-Requirements Contract
                Pursuant to which Basin Assumed the Risk of Change to a Tri-State
                Eastern Interconnection Member's Load ............................................24

1.    Basin Voluntarily Assumed the Risk of Load Loss when Negotiating for an All-Requirements Contract.........................................24

2.    The Loss Risk Assumed by Basin for NRPPD's Withdrawal from Tri-State is Minimal. ........................................................26

C.    NRPPD's Withdrawal From Tri-State is Permissible under the Eastern Interconnection WPC..........................................................27

1.    Section 9 of the Eastern Interconnection WPC Allows NRPPD's Departure From Tri-State.........................................27

2.    The Eastern Interconnection WPC's Section 9 is Substantially Different from the Termination Provisions of the Other Basin WPCs. ....................................................................30

3.    The Language of the Eastern Interconnection WPC is Consistent with the Commission's Adopted BSA CTP Methodology for Western Interconnection Members, and Results in a Just and Reasonable CTP for Eastern Interconnection Members. ..........................................31

D.    To the Extent the Eastern Interconnect WPC is Interpreted to Block NRPPD's Withdrawal from Tri-State, it is Unjust and Unreasonable..................34

1.    NRPPD's Proposed Withdrawal From Tri-State Will Benefit, Not Harm Basin and Therefore any Exit Fee Amounts to a Windfall to Basin and is not Just and Reasonable. ....................................34

2.    NRPPD's Exit from Tri-State would Provide Basin with Benefits, Particularly in the Current Market................................36

3.    NRPPD's Exit from Tri-State would Have Minimal or No Effect on Basin's Quantitative Credit Rating Metrics and Creditworthiness ....................................................39

4.    The Doctrine of Impossibility of Performance Excuses Tri-State's Performance of the Eastern Interconnection WPC, Precluding any Claim of Breach. ...............................................40

5.    Preventing Tri-State from Fully Complying with a FERC Order is Unjust and Unreasonable because it would Violate Several Regulatory Principles...........................................44

E.    Basin and Tri-State must Refund NRPPD for Consistent Overcharging of Tri-State Members. ................................................49

**PUBLIC VERSION**

F.    The CTP Developed in the Tri-State Order for Eastern Interconnection Customers Must Conform to the Commission Findings Related to this Complaint.................................................................................................50

V.    REQUEST FOR FAST-TRACK PROCESSING.................................................................50

VI.    RULE 206 REQUIREMENTS .........................................................................................51

VII.    CONCLUSION.............................................................................................................55

PUBLIC VERSION

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Northwest Rural Public Power District | ) | |
| Complainant | ) | |
| | ) | Docket No. EL24-___-000 |
| v. | ) | |
| | ) | |
| Basin Electric Power Cooperative | ) | |
| and | ) | |
| | ) | |
| Tri-State Generation and Transmission | ) | |
| Association, Inc. | ) | |
| | ) | |
| Respondents | ) | |

**SECTION 206 COMPLAINT AND REQUEST FOR FAST TRACK PROCESSING OF NORTHWEST RURAL PUBLIC POWER DISTRICT**

Pursuant to Sections 206, 306, and 309 of the Federal Power Act (FPA)[1] and Rule 206 of the Federal Energy Regulatory Commission's (FERC or Commission) Rules of Practice and Procedure,[2] Northwest Rural Public Power District (NRPPD) submits this Complaint against Basin Electric Power Cooperative (Basin) and Tri-State Generation and Transmission Association, Inc. (Tri-State). At nearly every turn, first Tri-State, and now Basin, have attempted to prevent Tri-State's Class A members – including NRPPD – from terminating their Wholesale Electric Service Contracts (WESC) with Tri-State. Over years of administrative proceedings before the Commission, including hearings, FERC has continually acknowledged that Member withdrawals from Tri-State are a just and reasonable part of Tri-State's filed rate.[3] Most recently, in *Tri-State Generation and Transmission Ass'n, Inc.*, 185 FERC ¶ 61,201 (Dec. 19, 2023) (Tri-

---

[1] 16 U.S.C. §§ 824e; 825e; 825h.

[2] 18 C.F.R. § 385.206.

[3] 16 C.F.R. § 824d(a).

PUBLIC VERSION

State Order), the Commission adopted a Contract Termination Payment (CTP) Methodology based on a Balance Sheet Approach (Adopted BSA Methodology) that permits Tri-State Member-Owners (Members), such as NRPPD, to terminate their WESCs with Tri-State and procure power in the competitive marketplace.

Its considerable market power threatened by the Tri-State Order, Basin has twice sought an alternative ruling through creative forum shopping. Its first complaint, filed before the United States District Court for the District of North Dakota, was dismissed, with the Court deferring to the Commission's primary jurisdiction over the issue.[4] Basin has now brought a new complaint, styled as a contract complaint, seeking to collaterally attack the Tri-State Order in the same forum.[5] In so doing, Basin is trying to stop the Commission's long-standing and thoughtful effort to develop a competitive electric market in the Midwest. In contravention to the Tri-State Order, Basin is trying to use its market power to prevent NRPPD from exercising its right to withdraw from Tri-State.

Either in response to Basin's concerted actions, or of its own accord, Tri-State is creating unjust and unreasonable roadblocks to proper implementation of the Tri-State Order. Tri-State has proposed an unjust and unreasonable element to its Tariff, preventing its Eastern Interconnection Members from withdrawing from Tri-State if a "court or other adjudicative authority" issues an order enjoining such Members from withdrawal, or finds that withdrawal

---

[4]    *Basin v. Tri-State*, No. 3:21-cv-00220-PDW-ARS, 2022 U.S. Dist. LEXIS 237838, at *28 (D. N.D. Oct. 31, 2022) at *28 (*Basin I* Order).

[5]    *Basin Elec. Power Coop. v. Tri-State Generation & Transmission Ass'n*, No. 24-cv-0008 (D. N.D. filed Jan. 12, 2024) (Basin II Complaint).

PUBLIC VERSION

will violate the terms of the all-requirements Wholesale Purchase Contract between Basin and Tri-State (Eastern Interconnection WPC).[6]

Basin's contract interpretation claims are rightfully within the primary jurisdiction of the Commission.[7] For the reasons discussed below, NRPPD respectfully requests that the Commission institute a Section 206 proceeding and exercise primary jurisdiction over the interpretation of the Tri-State Order and Eastern Interconnection WPC. Moreover, NRPPD requests that the Commission hold that NRPPD's withdrawal from Tri-State is permissible under the Eastern Interconnection WPC, and that the Adopted BSA CTP calculation as determined by NRPPD Witness Hibbard is the appropriate methodology to determine NRPPD's exit fee. In the alternative, NRPPD asks that the Commission find that the Eastern Interconnection WPC is not just and reasonable to the extent it is found to bar the Commission from fully implementing the Tri-State Order by preventing NRPPD's orderly withdrawal from Tri-State.[8] To the extent that the Commission, after interpreting the Eastern Interconnection Agreement determines that NRPPD's withdrawal from Tri-State requires a payment from Tri-State to Basin that is different from the CTP found to be just and reasonable in the Tri-State Order, NRPPD respectfully requests that the Commission amend the Tri-State Order to reflect the new CTP.

NRPPD also seeks refunds from Tri-State because Basin has been systematically overcharging Tri-State and NRPPD for sales of power and energy under the Eastern Interconnection WPC. Tri-State, in turn, has been passing the illegal overcharges to all its

---

[6]  *Tri-State Generation and Transmission Ass'n., Inc.*, Docket No. ER28-2181, Tri-State Generation and Transmission Association, Inc. Revisions on Compliance to Rate Schedule No. 281 (Jan. 25, 2024) (Compliance Filing) (*citing* Second Amended and Restated Wholesale Power Contract for the Eastern Interconnection, dated September 27, 2017 by and between Basin and Tri-State).

[7]  *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 582 (1981).

[8]  16 U.S. Code § 824e.

PUBLIC VERSION

Members through Tri-State's rolled-in A-40 rate structure. Basin has been charging Tri-State and NRPPD for its financial losses caused by its operation of Basin's Urea facility which, along with other costs, are not permitted to be recovered under Section 6(C) of the Eastern Interconnection WPC. Tri-State has failed its fiduciary duty to NRPPD and other Members by not challenging the illegal overcharges by Basin, and NRPPD seeks a refund of those illegal overcharges from both Basin and Tri-State.

Finally, NRPPD respectfully requests that the Commission set this Section 206 proceeding for fast-track procedures, and decide the issue on the papers as contemplated pursuant to Section 206(h)(1) of the FERC's Rules of Practice and Procedure,[9] because a full hearing process will delay NRPPD's intended withdrawal date of May 1, 2024.

## I.    COMMUNICATIONS

Communications in this matter should be directed to the following persons, who should also be designated for service on the Commission's official service list:

Chance Briscoe
Northwest Rural Public Power District
5613 State Highway 87
Hay Springs, NE 69347
(308) 638-4445
cbriscoe@nrppd.com

Richard M. Lorenzo
J.D. Taliaferro
Nicole A. Travers
Loeb & Loeb LLP
901 New York Avenue NW
Suite 300E
Washington, DC 20001
(202) 618-5000
rlorenzo@loeb.com
jtaliaferro@loeb.com
ntravers@loeb.com

---

[9]    18 C.F.R. § 835.206(h)(1).

## II.   INTRODUCTION

### A.  The Parties:

1.   <u>Northwest Rural Public Power District</u>:

NRPPD is a small public power district operating on a not-for-profit basis, located in the northern part of the Nebraska Panhandle, and serving customers via approximately 3,300 electric meters in its service area in northwest Nebraska. NRPPD is a member of Tri-State. As a public power district, NRPPD is not a Public Utility under the FPA.

2.   <u>Basin Electric Cooperative</u>:

Basin is a large not-for-profit, member-owned electric cooperative corporation organized under North Dakota law. Basin's principal place of business is 1717 East Interstate Avenue, Bismarck, North Dakota, 58503. Basin owns and operates electric generation and transmission facilities across nine states serving 3 million consumers. At end of year 2022, Basin Electric operated 5,219 megawatts (MW) of wholesale electric generating capability and had 7,384 MW of generating capacity within its resource portfolio.[10] Because of its large footprint and its significant generating capacity, Basin exercises considerable market power in its area. Since 2019, Basin has been a public utility under the FPA subject to the jurisdiction of, and regulated by, the Commission.[11] The vast majority of the electric power it generates is sold via Wholesale Power Contracts (WPC) to 19 "Class A" member-owners, including Tri-State, pursuant to a rate on file with and subject to the jurisdiction of the Commission.[12]

---

[10]   Basin Electric Power Cooperative: About Us, *available at* https://www.basinelectric.com/about-us/index.

[11]   18 C.F.R. 824(a).

[12]   *Basin II* Complaint at ¶ 11.

3.  Tri-State Generation and Transmission Association, Inc.:

Tri-State is also a member-owned electric cooperative corporation and is organized under Colorado law. Tri-State's principal place of business is 1100 West 116th Avenue, Westminster, Colorado, 80234. Tri-State is a Class A member (i.e., owner) of Basin. Since September 1, 2019, Tri-State has been a public utility under the FPA, subject to the jurisdiction of and regulated by the Commission.[13] Tri-State supplies power to its Member-Owners (Members) pursuant to WESCs, which are filed with the Commission.[14] The Eastern Interconnection WPC is an all-requirements contract whereby Basin agrees 1) to provide Tri-State with all the electric energy and power that Tri-State needs to satisfy the demands of Tri-State's Eastern Interconnection Members, even as those loads go up or down over the course of a day, a week, a season, or over longer periods over time.[15] Because the Eastern Interconnection WPC is an all-requirements contract, Basin assumed the risk that Tri-State's load and the energy and power that Basin was obligated to deliver to Tri-State would change over the term of the WPC.

## III.    FACTUAL BACKGROUND

### A.    The Basin-Tri-State-NRPPD Relationship

NRPPD has been a Member of Tri-State since Tri-State became a Generation and Transmission Cooperative ("G&T") in the 1950s. NRPPD is located in the Eastern Interconnection portion of the Tri-State system, where Tri-State owns no generation and only limited transmission facilities. In order to serve NRPPD, Tri-State purchases wholesale power

---

[13]    *Tri-State Generation and Transmission Ass'n., Inc.*, 170 FERC ¶ 61,224 at P. 82 (Mar. 20, 2020).

[14]    *Tri-State Generation and Transmission Ass'n., Inc.*, Docket No. ER21-2818, Tri-State Generation and Transmission Association, Inc., Revisions to Rate Schedule FERC No. 281 (Modified CTP Methodology) Transmittal Letter at P. 2 (Sep. 1, 2021).

[15]    Exh. No. NPD-0008: Prepared Direct Testimony of Susan F. Tierney, PhD. on behalf of Northwest Rural Public Power District (Tierney Direct) at 3:11-14.

PUBLIC VERSION

from Basin pursuant to the Eastern Interconnection WPC, which is on file with the Commission as Basin rate Schedule 16A. Tri-State then sells that wholesale power to its Eastern Interconnection Members, including NRPPD, under the terms of its WESCs. Tri-State's WESC with NRPPD is also a jurisdictional rate filed before the Commission as Tri-State Rate Schedule No. 24.[16] Both Tri-State and Basin are public utilities under the FPA,[17] and as such, their rates for wholesale electric service are subject to the exclusive jurisdiction of this Commission.[18]

Under the terms of those WESCs, Tri-State Members are obligated to purchase not less than 95% of their requirements for wholesale energy from Tri-State through 2050.[19] The extraordinarily long terms of these WESCs result in Tri-State's Members being captive customers of Tri-State, and unable to obtain service from more cost-effective competitors, thus frustrating and stifling the development of competitive markets in Tri-State's service areas contrary to the Commission's policy of encouraging competition.[20] For much of the past decade, NRPPD has carefully and thoughtfully pursued a legal withdrawal from its WESC with Tri-State.

When Tri-State was founded in the 1950s it was a "paper G&T," meaning that Tri-State did not own or operate generation or transmission assets, but merely administered its Members' Western Area Power Administration (WAPA) power supply allocations.[21] Since all Tri-State Members were initially similarly situated, Tri-State developed a "postage stamp" stated rate,

---

[16] *Tri-State Generation and Transmission Ass'n., Inc.*, 172 FERC ¶ 61,172 at P. 2 (Aug. 28, 2020).

[17] 16 U.S.C. § 824(e)

[18] 16 U.S.C. § 824(a).

[19] Tri-State Rate No. 24 at Section 12.

[20] Exh. No. NPD-0008, Tierney Direct at 15:11-16.

[21] *Tri-State Generation and Transmission Ass'n., Inc.*, Docket No. ER20-2818, Tr. at 1828:16-1829:2 (Briscoe Redirect) (May 13, 2022).

charging all members the same rate for the service of administrating their federal hydropower allotments, which were administrated first by the Bureau of Reclamation, and later by WAPA. Today, however, Tri-State owns and operates extensive generation and transmission resources that are overwhelmingly integrated into the Western Interconnection, and thus serve and benefit only Tri-State's Western Interconnection Members.[22] Despite the fact that NRPPD and other exclusively Eastern Interconnection Members receive no service or other benefits from Tri-State's generation and transmission resources, they are forced to subsidize Western Interconnection Members through Tri-State's rolled-in rate.

### B.  The Eastern Interconnection WPC

Basin became a Public Utility. and therefore became subject to jurisdiction of the Commission on September 15, 2020,[23] while Tri-State became subject to FERC jurisdiction on September 3, 2019.[24] Prior to becoming subject to the Commission's jurisdiction, Basin and Tri-State entered into the Eastern Interconnection WPC on September 27, 2017. As neither Basin nor Tri-State were public utilities at the effective date of the agreement, there is no reason to believe that the Eastern Interconnection WPC was drafted to comply with the FPA's Section 205's requirement that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection…sale of electric energy subject to the jurisdiction of the Commission…shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful."[25] Consequently, there is no reason to believe that the Eastern Interconnection

---

[22]  Docket No. ER20-2818, Tr. at 1122:4-1123:4 (Nebergall Cross) (May 10, 2022).

[23]  *Basin Elec. Power Coop.*, 172 FERC ¶ 61,221 (Sept. 14, 2020).

[24]  *Tri-State Generation and Transmission Ass'n., Inc*., 170 FERC ¶ 61,224 (Mar. 20, 2020).

[25]  16 U.S. Code § 824d.

WPC was ever fully scrutinized to determine whether it met the FPA's just and reasonable standard. As the Commission has found in an earlier Basin proceeding:

> Our investigation of Basin's 2020 Rate Schedule A and Wholesale Power Contracts does not entitle Basin to any evidentiary presumption of justness and reasonableness or reduction in its burden to establish just and reasonable rates. *See Otter Tail*, 583 F.2d at 405 ("Under the statutory scheme, it would appear that initial rates are, in effect, presumed just and reasonable until the Commission determines otherwise."); *id.* at n.27 ("In making this observation, we do not mean to imply that merely because a rate schedule is in effect that an evidentiary presumption of reasonableness attaches.").[26]

Section 9 of the Eastern Interconnection WPC includes a provision that permits Tri-State to reorganize or transfer its assets in the Eastern Interconnection "so long as [Tri-State] shall pay such pro rata portion of the outstanding indebtedness, as well as other obligations and commitments of [Basin] at the time existing…."[27] Further, pursuant to Section 9, Basin approval is not required for such reorganizations or transfers so long as "[Tri-State] is a member of [Basin] and has…a contract for electric service substantially in the form of this Agreement."[28] Tri-State remains a Basin member and takes power under the same Eastern Interconnection WPC, and consequently any reorganization or transfer of its Eastern Interconnection assets – such as NRPPD's WESC with Tri-State – may take place without Basin approval so long as Tri-State pays the required pro rata portion of Basin's indebtedness.

When Basin became FERC-jurisdictional in 2019, Basin filed each of its 19 wholesale power contracts with its members, including the Eastern Interconnection WPC (filed as Basin Rate Schedule 16A).[29] In that proceeding McKenzie Electric Cooperative, Inc. ("McKenzie") and certain other parties protested Basin WPCs as not just and reasonable because they did not

---

[26]   172 FERC ¶ 61,221 at n.186 (2020).

[27]   Eastern Interconnection WPC at Section 9.

[28]   *Id.*

[29]   172 FERC ¶ 61,221 at P. 1.

contemplate early termination – and the associated withdrawal from the cooperative – prior to the expiration of their respective terms (*i.e.*, 2050 or 2075).[30] The Commission rejected these protests on the grounds that FERC did not then mandate that WPCs provide for early termination and withdrawal.[31] As will be addressed below, McKenzie's protests related to provisions that are significantly different than the Eastern Interconnection WPC Section 9, and the Commission's Order in that case does not control the instant proceeding.

### C.  The Tri-State CTP Methodology Proceeding Before FERC

Upon becoming FERC-jurisdictional, Tri-State initiated proceedings to determine the appropriate CTP for its Members to pay in order to withdraw from their WESCs with Tri-State.[32] During the course of those CTP proceedings, the Commission developed principles for evaluating whether exit provisions are just and reasonable. Any exit provision must (1) "provide clear and transparent procedures for utility members to obtain a CTP calculation"; (2) "provide for pre-termination calculations or any rules governing how such calculations are to be performed"; and (3) provide "detailed procedures governing when and how a utility member may obtain a CTP calculation."[33] In addition, the Commission held that a Member's withdrawal cannot be conditioned on the sole and unlimited discretion of the G&T or its Board of Directors, because such conditions "impose[] excessive and unjustified barriers to utility members seeking information to assess whether to terminate their WESCs with Tri-State."[34]

---

[30]  *Id.* at P. 87.

[31]  *Id.*

[32]  Tri-State Order at P. 3.

[33]  *Tri-State Generation and Transmission Ass'n, Inc* 177 FERC ¶ 61,059 at P.8 (2021) (Hearing Order), *citing Tri-State Generation and Transmission Ass'n, Inc.*, 175 FERC ¶ 61,229 (2021).

[34]  *Tri-State Generation and Transmission Ass'n, Inc.,* 175 FERC ¶ 61,114 at P 52 (2021).

PUBLIC VERSION

The Tri-State Order acknowledged that permitting Tri-State Members, including NRPPD, to withdraw from Tri-State upon payment of its CTP (calculated pursuant to the Adopted CTP Methodology) is just and reasonable.[35] The Commission held that, under its Adopted CTP, Eastern Interconnection Members would be able to buy out their Power Purchase Agreements (PPAs), *i.e.*, the Basin and WAPA wholesale PPAs, based on their pro rata share of those contracts.[36] The Tri-State Order also provided Tri-State Members the ability to sleeve those PPAs under a Competitive Market Value Estimate (CMVE) calculated via the lost-revenues methodology initially posed by Tri-State "to the extent [it is] found to be permissible under the [Eastern Interconnection WPC]."[37] The Commission directed Tri-State to file a Compliance Filing implementing the approved CTP provisions in its Rate No. 281, and provide CTP calculations for all of its Members.[38]

Tri-State's Compliance Filing, submitted on January 25, 2024, confirmed that Tri-State had no interest in following the Commission's directives in the Tri-State Order. Tri-State included additional language in its updated Rate No. 281 specifying that Eastern Interconnection Members would not be permitted to withdraw from Tri-State if a court or another adjudicative entity declared that withdrawal would constitute a breach of the Eastern Interconnection WPC, or if a court issued an order enjoining Eastern Interconnection Members from withdrawal.[39]

---

[35]    16 U.S.C. § 824d(a).

[36]    Tri-State Order. at PP. 546, 583.

[37]    *Id*. at P. 554.

[38]    *Id*. at P. 1.

[39]    *Tri-State Generation and Transmission Ass'n., Inc.*, Docket No. ER21-2818, Tri-State Generation and Transmission Association, Inc. Revisions on Compliance to Rate Schedule No. 281 (Jan. 25, 2024) at Exh. B., Section III.A.

PUBLIC VERSION

Further, Tri-State provided a CTP calculation for NRPPD that was overstated.[40] Tri-State's proposed Rate No. 281 and CTP calculations are consequently unjust and unreasonable.

### D. Basin Proceedings before the District Court

1. Basin I Complaint

Tri-State's proposed CTP Methodology, initially filed on September 1, 2021, acknowledged that "Tri-State's Board of Directors has no discretion to prevent a utility member from terminating its membership in Tri-State," so long as the withdrawing Member provided Tri-State with a two-year notice of withdrawal, and paid Tri-State its CTP upon the date of its withdrawal.[41] This provision in Tri-State's CTP Methodology filing adhered to a prior Commission order declaring that it was unjust and unreasonable to provide Tri-State's Board of Directors with veto power over a Member's withdrawal.[42] Basin protested the lack of Board approval for withdrawals, arguing that the Commission should require both Tri-State Board approval and Basin approval for Eastern Interconnection Member withdrawal.[43] FERC rejected Basin's argument, and accepted Tri-State's Modified CTP Methodology for hearing procedures in FERC Docket No. ER21-2818 without including either a Tri-State Board approval requirement or a Basin approval requirement.[44] Thus, the Commission determined such unilateral veto power over Tri-State Member withdrawal was unjust and unreasonable. FERC also determined that the interpretation of the WPC was not properly before the Commission,

---

[40] *Id.* at Confidential Exh. D.

[41] *Tri-State Generation and Transmission Ass'n., Inc.*, Docket No. ER21-2818, Tri-State Generation and Transmission Association, Inc., Revisions to Rate Schedule No. 281 (Modified CTP Methodology) (Sept. 1, 2021) at p. 11.

[42] *Tri-State Generation and Transmission Ass'n, Inc.*, 175 FERC ¶ 61,114 at P. 52 (2021)

[43] *Tri-State Generation and Transmission Ass'n., Inc.*, Docket No. ER21-2818, Comments of Basin Electric Power Cooperative in Response to Tri-State Generation and Transmission Association, Inc. Response to Order to Show Cause (Sept. 22, 2021).

[44] Hearing Order at P. 121.

rejecting Basin's contention that the approval of a CTP Methodology would constitute a breach of that agreement.[45]

Basin did not request rehearing or reconsideration of FERC's Hearing Order, nor did it further participate in discovery, briefing, or hearing procedures in the FERC CTP Proceeding. Rather, on December 17, 2021, Basin attempted to collaterally attack the Hearing Order by filing its first Complaint ("*Basin I*") before the United States District Court for the District of North Dakota. In its Complaint, Basin alleged that Tri-State had breached the Eastern Interconnection WPC by complying with the FERC Order that rejected Board of Director veto power over Member withdrawals.[46] Basin further sought a determination that Tri-State intended to breach the Eastern Interconnection WPC by allowing its Eastern Interconnection Members from withdrawing from their WESCs. Basin's Complaint sought declaratory and injunctive relief, including but not limited to, directing and requiring Tri-State to amend the Modified CTP with FERC, and prohibiting and restraining Tri-State from allowing or threatening to allow any Eastern Interconnection Member from terminating their WESC with Tri-State.[47] Basin wrongly claimed that the North Dakota Federal District Court, not FERC, held jurisdiction over the Eastern Interconnection WPC on the grounds that "FERC lacks jurisdiction over state-law contract issues and, as a policy, will not decide contract disputes."[48]

---

[45]  *Id*. at P. 126.

[46]  *Basin Elec. Power Coop. v. Tri-State Generation & Transmission Ass'n*, No. 3:21-cv-220, (D. N.D.) (*Basin I*) Complaint at ¶¶ 55-61.

[47]  *Id*. at pp. 24-25.

[48]  *Id*. at ¶ 62.

Unsurprisingly, the North Dakota Federal District Court dismissed the *Basin I* Complaint because FERC – and not the Court – had primary jurisdiction over Basin's claim.[49] Specifically, the Court held that "the relief sought by Basin is certainly specialized and unique to FERC and the ongoing FERC proceeding."[50] The Court further declared:

> In the Court's view, this case requires coordination in judicial and administrative decision making. FERC's agency expertise on the issue of early termination and filed rates, along with the need for uniformity and consistency in decision making, places this case within the doctrine of primary jurisdiction. To provide Basin the remedy it seeks, it will become necessary to become entangled in the regulatory aspects of FERC and directly in the ongoing FERC proceeding. And, perhaps most importantly, given the remedies Basin seeks, there is a high risk of inconsistency and contradictory decisions if this Court retains jurisdiction.
>
> * * *
>
> [T]he Court defers primary jurisdiction of Basin's claims in its amended complaint to FERC.

Following the District Court's dismissal of the *Basin I* Complaint, Basin had the option of seeking an interpretation of the Eastern Interconnection WPC from FERC. However, Basin did not appropriately participate in FERC Docket No. ER21-2818 in order to assert its claim, nor did it seek an appropriate remedy from the Commission by filing a complaint under FPA Section 206. Rather, Basin only answered Tri-State's Motion to Lodge the *Basin I* Order. and the responses to said Motion by NRPPD and United.[51] Consequently, Basin did not provide the FERC with any substantive information or arguments regarding the Eastern Interconnection WPC, and the FERC ultimately declined to make any ruling on the subject.[52]

---

[49] *Basin v. Tri-State*, No. 3:21-cv-00220-PDW-ARS, 2022 U.S. Dist. LEXIS 237838, at *28 (D. N.D. Oct. 31, 2022) (*Basin I* Order).

[50] *Id*. at *29.

[51] Tri-State Order at P. 42.

[52] *Id*. at n.900.

2. *Basin II* Complaint

Following the Commission's issuance of the Tri-State Order, Tri-State wrote to Basin requesting that Basin provide a proposed buyout number that would allow NRPPD to withdraw from Tri-State and would "make[] Basin whole under the [Eastern Interconnection] WPC."[53] Basin responded to Tri-State's offer by refusing to propose such a buyout amount on the grounds that Basin would suffer "irreparable injury which cannot properly or adequately compensated [sic] by the mere payment of damages."[54] Basin also informed both Tri-State and NRPPD of its second complaint filed before the same North Dakota Federal District Court[55] (*Basin II* Complaint) on January 12, 2024.

In the *Basin II* Complaint, Basin claimed that "[a]fter the [United States District Court for the Circuit of North Dakota, Eastern Division] dismissed *Basin I*, Basin sought relief from FERC."[56] Basin included no citations to the alleged relief that Basin sought from FERC, because there are none. As discussed above, Basin did not perform any actions to seek relief before FERC, either by participating in Docket No. ER21-2818, nor by filing a Section 206 Complaint before FERC seeking a declaratory order interpreting the Eastern Interconnection WPC. Rather, Basin is using its new Complaint to once again attempt to collaterally attack the Tri-State Order before a venue that does not have jurisdiction over Basin's claims.

---

[53] Exh. No. NPD-0020: Letter from Frederick J. Bauman to Lisa T. Simpson and Nicole A. Travers, Re: Tri-State/Basin WPC (Jan. 16, 2024) at p. 2.

[54] NPD-0021: Letter from Lisa T. Simpson to Frederick J. Baumann and Nicole A. Travers, Re: Second Amended and Restated Wholesale Power Contract for the Eastern Interconnection by and between Basin and Tri-State (Jan. 19, 2024) at p. 1.

[55] *Basin Elec. Power Coop. v. Tri-State Generation & Transmission Ass'n*, No. 3:21-cv-00008, (D. N.D. Jan. 12, 2024) (*Basin II* Complaint).

[56] *Basin II* Complaint at ¶ 7.

PUBLIC VERSION

Basin alleges that by complying with Tri-State Order, Tri-State will cause Basin "irreparable harm," and that therefore it is entitled to "specific performance," constituting a declaratory judgment that Tri-State has breached the Eastern Interconnection WPC,[57] a Preliminary Injunction against Tri-State allowing any Eastern Interconnection Member to withdraw from its WESC,[58] and a Permanent Injunction preventing Eastern Interconnection Members to ever withdraw from their WESCs,[59] in direct contravention of the Tri-State Order. As of this filing, Basin's Motion for Preliminary Injunction is fully briefed and awaiting further action by the Court. NRPPD hereby files this Section 206 Complaint, respectfully requesting that the Commission confirm that it alone has jurisdiction over subject matter of the *Basin II* Complaint, and that the relief Basin seeks would result in an unjust, unreasonable, and unduly discriminatory and preferential rate for Tri-State's Eastern Interconnection Members, as discussed in detail below.

## IV.    ARGUMENT

### A. The Commission Has Primary Jurisdiction over the Eastern Interconnection WPC and Should Interpret Its Terms

1.   The Eastern Interconnection WPC is a Filed Rate before the FERC.

In 2019 and again in 2020, pursuant to FPA §205[60] and part 35 of the Commission's regulations,[61] Basin filed, and subsequently refiled its Rate Schedules No. 1 through No. 19, representing long-term, wholesale power contracts between Basin and 19 of its electric cooperative, municipality, and public power district members, including the Eastern

---

[57]   *Basin II* Complaint at ¶ 159.

[58]   *Id.* at ¶ 163.

[59]   *Id.* at ¶ 167.

[60]   16 U.S.C. § 824d.

[61]   18 C.F.R. Part 35 (2020).

Interconnection WPC.[62] The Commission found that Basin's Rate Schedule A, which included the Eastern Interconnection WPCs, represented "jurisdictional service" to Basin's wholesale customers.[63] As the FPA "allocates to FERC exclusive jurisdiction over 'rates and charges…received…for or in connection with' interstate wholesale sales,"[64] FERC has the exclusive authority to determine the reasonableness of Eastern Interconnection WPC.

 2.  The *Basin I* Court Deferred Primary Jurisdiction of Basin's Claim to FERC.

The District Court in *Basin I* deferred to the Commission, finding that "this case requires coordination in judicial and administrative decision making. FERC's agency expertise on the issue of early termination and filed rates, along with the need for uniformity and consistency in decision making, places this case within the doctrine of primary jurisdiction."[65] As a result, "the Court defers primary jurisdiction of Basin's claims in its amended complaint to FERC."[66] In its *Basin II* complaint, Basin claims that "[a]fter the [United States District Court for the Circuit of North Dakota, Eastern Division] dismissed Basin I, Basin sought relief from FERC."[67] However, Basin did not file a Section 206 Complaint before the FERC seeking a declaratory order interpreting the Basin/Tri-State PPA, which is the sole avenue to seek original relief from FERC. Basin's false claim is further belied by footnote 900 to the Tri-State Order, in which the Commission stated "[w]e decline to address whether there has been a breach of the Basin Eastern Requirements PPA, because that issue is not before the Commission in this proceeding."[68] In

---

[62]  172 FERC ¶ 61,221 at P. 1.

[63]  *Id.* at P. 34

[64]  *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (*quoting* 16 U.S.C. § 824d(a)).

[65]  *Basin I*, 2022 U.S. Dist. LEXIS 237838, at *31 (D. N.D. Oct. 31, 2022).

[66]  *Id.*

[67]  *Basin II* Complaint at ¶ 7.

[68]  Tri-State Order at n.900.

short, Basin erred by bringing its complaint to a Federal District Court, rather than seeking direct review of the Tri-State Order in the Courts of Appeal.

### 3. The Eastern Interconnection WPC is Jurisdictional under the *Arkla* Standard.

In *Ark. La. Gas Co. v. Hall*, 7 FERC ¶ 61,175 at 61,322 (May 18, 1979) (*Arkla*), the Commission set out a three-pronged test to determine whether the FERC will exercise primary jurisdiction over a Section 206 contract dispute:

1. Whether the Commission possesses some special expertise which makes the case particularly appropriate for a Commission decision;

2. Whether there is a need for uniformity of interpretation of the type of question raised in the dispute; and

3. Whether the case is important in relation to the regulatory responsibilities of the Commission.

The instant dispute satisfies all three prongs of the *Arkla* test, and the Commission has primary jurisdiction over that Agreement.

### i. The Commission Possesses Special Expertise in Deciding the Instant Dispute.

The Eastern Interconnection WPC involves the sale in interstate commerce of wholesale electrical energy and power from one FERC-jurisdictional Public Utility (Basin) to another FERC-jurisdictional Public Utility (Tri-State), who, in turn resells it to NRPPD for resale to end-user consumers. The Eastern Interconnection WPC also involves the accompanying rates and charges of the public utilities. FPA Section 201 grants this Commission exclusive and plenary jurisdiction over such sales.[69] Pursuant to FPA Sections 205 and 206, the Commission has jurisdiction over and authority to review, interpret, and modify the rates, charges, and terms and

---

[69]    16 U.S.C. §824(a).

conditions of such sales to determine if they are just and reasonable and not unduly discriminatory.[70]

Because the Eastern Interconnection WPC was executed before Basin became subject to the Commission's jurisdiction, it is reasonable to assume that the parties to the WPC did not draft or negotiate the agreement to comply with the requirements of FPA Section 205. Further, no party has specifically challenged the terms of the Eastern Interconnection WPC following Basin's filing of all of its wholesale agreements after becoming FERC-jurisdictional. Thus, this proceeding will be the Commission's first opportunity to scrutinize the Eastern Interconnection WPC to ensure its terms are just and reasonable.

Basin seeks to interpose its interpretation of the un-reviewed Eastern Interconnection WPC to prevent the Commission from implementing the filed rate that FERC found just and reasonable. Basin also seeks to prevent NRPPD, which is not a party to the Eastern Interconnection WPC, from exercising its right to terminate its WESC with Tri-State pursuant to terms and conditions that the Commission has already found to be just and reasonable.

Interpreting the requirements of the FPA and the filed rate doctrine are clearly areas where the Commission – not the courts – has special expertise. *See Southwest Power Pool, Inc.*, 180 FERC ¶ 61,110 at P. 58 (Aug. 22, 2022) (exercising primary jurisdiction where the dispute involved the requirements of the FPA and the filed rate doctrine – two areas where the Commission has special expertise); *Sacramento Mun. Util. Dist. v. Pac. Gas & Elec. Co.*, 37 FERC ¶ 61,323 at 61,943 (Dec. 30, 1986) (exercising primary jurisdiction where deciding allegations of FPA violations required the Commission's special expertise); *Linden VFT, LLC v. Brookfield Energy Mktg. L.P.*, 143 FERC ¶ 61,109 at n.21 (May 8, 2013) (exercising primary

---

[70]    16 U.S.C. §§ 824(d); 824(e).

jurisdiction where the "dispute involves the interpretation of Commission regulations and policy regarding negotiated rate agreements"); *New Eng. Power*, 67 FERC ¶ 61,042 at 61,128 (Apr. 11, 1994) (exercising primary jurisdiction where the Commission "possesses special expertise over a dispute that required interpretation of a wholesale electric power pooling arrangement among utilities throughout the New England states" and where there had been "numerous contested proceedings before the Commission" regarding the contract at issue).

As discussed above, in the *Basin I* case, the North Dakota Federal District Court granted Tri-State's motion to dismiss Basin's complaint on the grounds that the Commission – not the Court – had primary jurisdiction over this dispute. The *Basin I* Court recognized that the Commission "regulates early termination rates, exits [sic] rates, or buy-outs when a buy-out is offered, and it determines whether the early termination rate is 'just' and 'reasonable'"[71] and accordingly held that "FERC's agency expertise on the issue of early termination and filed rates, along with the need for uniformity and consistency in decision making, places this case within the doctrine of primary jurisdiction."[72] Therefore, the first prong of the *Arkla* test is easily satisfied here.[73]

---

[71] *Basin I* Order at *4.

[72] *Id.* at *31.

[73] The cases in which the Commission declined to exercise primary jurisdiction over a contract dispute are inapposite. Those cases involved purely principles of contract interpretation. *See City of Vernon*, 115 FERC ¶ 61,374 at P. 41 (June 28, 2006) (finding no special expertise where the dispute "turn[ed] on standard contract and/or tort principles and do not address matters arising under the FPA."); *Andeavor Field Servs., LLC v. Mid-America Pipeline Co., LLC*, 163 FERC ¶ 61,209 at P. 29 (June 21, 2018) (finding that the dispute only centered on principles of contract interpretation and thus the Commission did not have any special expertise). In contrast, the instant Complaint does not merely involve a simple breach of contract. Rather, it involves the interpretation of the Tri-State Order to determine if the Eastern Interconnection WPC, a FERC-jurisdictional rate, is breached by an NRPPD exit of Tri-State and if so, whether the Eastern Interconnection WPC is unjust and unreasonable. As the *Basin I* Court recognized, "while framed as a simple breach of contract dispute by Basin, the reality is far more nuanced… Particularly telling is that the prayer for relief strangely seeks no money damages from the alleged breach…the relief sought by Basin is certainly specialized and unique to FERC." *Basin I* Order at *29-31.

ii.  There Is a Need for Uniformity of Interpretation of the Type of Question Raised in the Instant Dispute.

The nature of this dispute inevitably will require uniformity of interpretation of whether other Eastern Interconnection Members of Tri-State can withdraw from their respective WESCs. There is need for uniformity of interpretation of withdrawal provisions contained within FERC-jurisdictional rates to ensure that cooperative members receive the same treatment with regard to their withdrawal options. In addition, Basin has a wholesale power agreement with Tri-State for its Western Interconnection Members, and the interpretation of the Eastern Interconnection WPC should be consistent with the interpretation of those contracts to ensure neither are unduly discriminatory or preferential to one subset of Members. *See New Eng. Power*, 67 FERC ¶ 61,042 at 61,128 (Apr. 11, 1994) (exercising primary jurisdiction where "[t]here is a need for uniformity of interpretation of the NEPOOL Agreement which only this Commission can provide; no single state of the states served by NEPOOL participants can act to assure uniform interpretation of the NEPOOL Agreement"); *Southwest Power Pool, Inc.*, 180 FERC ¶ 61,110 at P. 58 (Aug. 22, 2022) (exercising primary jurisdiction where "there is a need for uniformity [] across the industry as whole [] in interpreting the question raised in the dispute (i.e., whether entities may be entitled to additional compensation beyond the public utility's filed rate based on contract claims)"); *Linden VFT, LLC v. Brookfield Energy Mktg. L.P.*, 143 FERC ¶ 61,109 at n. 21 (May 8, 2013) (exercising primary jurisdiction where "there is a need for uniformity of interpretation of these tariff and service agreement provisions" which involved interpretation of Commission regulations and policy regarding negotiated rate agreements); *Blumenthal v. NRG Power Mktg.*, 103 FERC ¶ 61,344 at P. 72 (June 25, 2003) (exercising primary jurisdiction

where "market participants must be able to rely on uniform policies regarding the impact of changes brought about by the implementation of LMP [location-based pricing] on parties' rights under pre-existing contracts").

The *Basin I* court also recognized that – given Basin's request for relief – the dispute would "indirectly impact the Eastern Interconnection members that are not a party to the Eastern Interconnection WPC, supporting the need for FERC review,"[74] and would lead to a "high risk of inconsistency and contradictory decisions if this Court retains jurisdiction."[75] The *Basin I* Court further emphasized that Tri-State had turned to the Commission to "establish[] a standardized exit charge or CTP methodology for its members"[76] due to the "scattered venues and absence of uniformity in the regulatory bodies and courts overseeing contract terminations."[77] As such, it is evident that there is a need for uniformity in the instant dispute and the second prong is also easily satisfied here.

        iii.    <u>The Instant Dispute is Important in Relation to the Regulatory Responsibilities of the Commission.</u>

The final prong of the *Arkla* test is closely tied to the first prong. The issue presented here is whether Basin can interpose the Eastern Interconnection WPC to prevent the Commission from implementing a rate that it has already found to be just and reasonable, and thus stifle the development of a competitive electric market in the Midwestern United States. The Commission should institute a Section 206 proceeding on the instant dispute because the Commission's policy of fostering competition is central to its regulatory responsibilities. *See Phelps Dodge Corp. v. El*

---

[74]   *Basin I* Order at *30.

[75]   *Id*. at *31.

[76]   *Id*. at *8.

[77]   *Id*.

*Paso Nat. Gas Co.*, 84 FERC ¶ 61,043 at 61,185 (July 17, 1998) (exercising primary jurisdiction over a contract dispute where it would implicate "Commission's policies of fostering a competitive market for gas supplies and as much access as possible between willing buyers and sellers of gas."); *Reg'l Transmission Orgs.*, 87 FERC ¶ 61,173 at 61,684 (May 13, 1999) (recognizing the Commission's "dual goals of eliminating undue discrimination and promoting competition in electric power markets").

The outcome of the CTP Proceeding before the FERC has raised uncertainty about how Tri-State will be able to implement the Tri-State Order, which would allow Tri-State Members to choose whether to remain with Tri-State, or exit their membership and obtain electric supply in the free market.[78] Should the Eastern Interconnection WPC prevent Eastern Interconnection Members from withdrawing from Tri-State, it would harm those Members' ability to exercise free choice of competitive wholesale electric supply. Such a result would run counter to FERC's decades-old policy of fostering competition in wholesale power markets.[79]

Accordingly, the final prong of the *Arkla* test is easily satisfied, and the Commission should exercise its primary jurisdiction over interpretation of the Eastern Interconnection WPC. *See Sacramento Mun. Util. Dist. v. Pac. Gas & Elec. Co.*, 37 FERC ¶ 61,323 at 61,943 (Dec. 30, 1986) (exercising primary jurisdiction where deciding claims of FPA violations were central to the Commission's regulatory responsibilities); *Blumenthal v. NRG Power Mktg.*, 103 FERC ¶ 61,344 at P. 72 (June 25, 2003) (holding that "the issues presented here are central to the Commission's regulatory responsibilities, because [] the Commission has jurisdiction under the FPA to interpret and enforce wholesale power contracts in interstate commerce, such as the

---

[78]   Exh. No. NPD-0008, Tierney Direct at 19:4-7.

[79]   *Id*. at 19:7-10.

[agreements at issue]"); *New Eng. Power*, 67 FERC ¶ 61,042 at 61,128 (Apr. 11, 1994) (finding that "[r]esolution of the issues surrounding the [agreement at issue] is important in relation to the Commission's regulatory responsibilities over matters involving the interstate sale for resale and transmission of electric energy by public utilities"); *N. States Power Co. Minn. v. S. Minn. Mun. Power Agency*, 55 FERC ¶ 61,101 at 61,344 (Apr. 24, 1991) (finding that the issue of the amount of transmission service provided under rate schedules on file with the Commission is central to the Commission's exercise of its responsibilities under the FPA); *Southwest Power Pool, Inc.*, 180 FERC ¶ 61,110 at P. 58 (Aug. 22, 2022) (finding that "this case is important to the Commission's regulatory responsibilities under the FPA, particularly the Commission's obligation to ensure that the rates, terms, and conditions of wholesale electric energy sales are just and reasonable and consistent with the rate on file with the Commission. If these types of compensation disputes for jurisdictional wholesale sales are raised in other forums, it runs the risk of undermining the Commission's enforcement of these obligations").

Because the three-pronged *Arkla* test is satisfied, NRPPD respectfully requests that the Commission accept NRPPD's complaint and institute a Section 206 proceeding to determine whether the Eastern Interconnection WPC can prevent implementation of the Tri-State Order.

**B. The Eastern Interconnection WPC Is An All-Requirements Contract Pursuant to which Basin Assumed the Risk of Change to a Tri-State Eastern Interconnection Member's Load.**

1. Basin Voluntarily Assumed the Risk of Load Loss when Negotiating for an All-Requirements Contract.

The Eastern Interconnection WPC is an all-requirements contract between Basin and Tri-State, pursuant to which Basin agreed to supply all of Tri-State's Eastern Interconnection power requirements. Under an all-requirements contract, the seller (Basin) assumes the risk of a change

in the buyer's (Tri-State) electricity requirements.[80] *See Appalachian Power Co. v. FERC*, 101 F.3d 1432, 1435 (D.C. Cir. 1996) (a requirements contract is one where "purchaser is to buy all its power from the contracting utility"). This is in contrast to a take-or-pay contract where the buyer assumes the risk of the achieving the minimum take. *See Associated Gas Distribs. v. FERC*, 263 U.S. App. D.C. 1, 824 F.2d 981, 1021 (D.C. Cir. 1987) (a take-or-pay contract requires a utility to "either to purchase a specified percentage of the producer's deliverable [gas or electricity] or to make 'prepayments' for that percentage anyway.").

In entering into an all-requirements contract with Tri-State, Basin assumed the risk that Tri-State's Eastern Interconnection load would rise or fall over time, with Basin still obligated to supply power to meet those loads.[81] If Basin wanted to guarantee a minimum revenue from Tri-State, Basin should have negotiated for a take-or-pay PPA for Tri-State's Eastern Interconnection loads, as it did for Tri-State's Western Interconnection, but it did not. Instead, at the eleventh hour, Basin now attempts to improperly rewrite its all-requirements contract in order to transform it into a take-or-pay contract so that the *de minimis* reduction in Tri-State's load that would result from NRPPD exit will be treated like the minimum take in a take-or-pay agreement.[82] Such an approach would reflect the lost-revenues methodology that FERC rejected

---

[80]  Exh. No. NPD-0008, Tierney Direct at 21:9-22:10. The Eastern Interconnection WPC is clearly an all-requirements contract. Section 2.B of the Eastern Interconnection WPC clearly states:

>  Seller [Basin] shall sell and deliver to Tri-State and Tri-State shall purchase and receive from Seller all electric power and energy which Tri-State shall require to supply its Member-Systems' loads in the Eastern Interconnection . . . and to the extent that the Seller [Basin] has the power available.

Section 2.C of the same contract clarifies that:

>  Seller shall also be obligated to sell and deliver to Tri-State, and Tri-State shall also be obligated to purchase and receive from Seller, electric power and energy . . . for changes to a Member-Systems' load due to natural cycles of growth or decline in its electric load serving obligation.

[81]  Exh. No. NPD-0008, Tierney Direct at 21:13-18.

[82]  *Id*. at 21:10-13.

in the Tri-State Order, and should similarly be rejected here.[83] Basin's attempt to escape the risk for which it willingly negotiated should be rejected.

    2.  <u>The Loss Risk Assumed by Basin for NRPPD's Withdrawal from Tri-State is Minimal.</u>

Despite the fact that Basin took on the risk of variable Tri-State Member Load when it entered into an all-requirements contract, NRPPD's withdrawal from Tri-State would not cause Basin to experience significant load loss. Even by Basin's own calculations, NRPPD makes up approximately 11% of Tri-State's total energy demands from the Eastern Interconnection.[84] Basin asserts that "each one of Tri-State's six all-requirement WESCs with its Eastern Interconnection Member-Systems represents a substantial portion of Tri-State's assets."[85] However, Basin has not provided any working definition of what constitutes a "substantial portion" of Basin's assets, or why NRPPD – by Basin's calculation, a small portion of said assets – would constitute a "substantial portion" such that Basin would be materially harmed by NRPPD's withdrawal.

Black's Law defines "substantial" as "[o]f, relating to, or involving substance; material…important, essential, and material."[86] "Substance," in turn, means "[t]he essence of something; the essential quality of something."[87] Under that definition, 11% is not a substantial portion of Tri-State's assets. In other contexts, courts have reached the same conclusion when determining whether a portion of something constitutes a "substantial" portion thereof. For

---

83   *Id*. at 13-17.

84   Exh. No. NPD-0001, Prepared Direct Testimony of Chance Briscoe on behalf of Northwest Rural Public Power District (Briscoe Direct) at 7:5-11.

85   *Basin II* Complaint at ¶ 49.

86   Black's Law Dictionary, 11th Edition.

87   *Id*.

example, in determining whether a "substantial portion" of a deposition was used to resolve an issue for purposes of assigning costs, a court found that 10% of a deposition was not a "substantial portion" of that deposition, no matter whether that portion of a deposition was considered more "important" than another portion.[88] Similarly, *Yocum v. United States*, 66 Fed. Cl. 579 (Fed. Cl. 2005) cites income tax regulations, stating:

> [A] change in the ownership of a substantial portion of a corporation's assets occurs on the date that any one person, or more than one person acting as a group, acquires…during the 12-month period…assets from the corporation that have a total fair market value equal to or more than one third of the total fair market value of all of the assets of the corporation immediately prior to such acquisition or acquisitions.[89]

The withdrawal of 11% of Tri-State's assets, even under Basin's self-serving reading of Section 9, does not constitute a substantial portion of Tri-State's assets. Consequently, despite Basin taking on the risk of Member withdrawals by entering into an all-requirements contract, NRPPD's withdrawal would not cause Basin any significant loss or harm, as it claims.

## C. NRPPD's Withdrawal From Tri-State is Permissible under the Eastern Interconnection WPC.

### 1. Section 9 of the Eastern Interconnection WPC Allows NRPPD's Departure From Tri-State.

The plain meaning of the Eastern Interconnection WPC allows Tri-State's Eastern Interconnection members to exit Tri-State without Basin's explicit consent so long as Tri-State pays a "pro rata portion of the outstanding indebtedness."[90] In its *Basin II* Complaint, Basin selectively relies on only a portion of Section 9 of the Eastern Interconnection WPC to argue that

---

[88] *Cordance Corp. v. Amazon.com, Inc.*, 855 F. Supp. 2d 244, 254 (D. Del. 2012) ("The issue, then, is whether 10% of a video deposition equals a substantial portion….Ten percent of a video deposition is not substantial"). The Court went on to explain that whether the parties "subjectively view the depositions as important or unimportant." was not the relevant consideration to determine whether something is "substantial." *Id.* at 252.

[89] *Id.* at 584.

[90] Eastern Interconnection WPC at Section 9.

Tri-State would be in breach of that contract if NRPPD were to leave without Basin's express permission. However, even a cursory review of the entire Section 9 demonstrates that Basin's distorted interpretation of the agreement is incorrect.

The current Eastern Interconnection WPC became effective on October 12, 2017, almost two years before either Basin or Tri-State became FERC-jurisdictional Public Utilities under the FPA.[91] Therefore, there was no obligation on either party to ensure that the Eastern Interconnection WPC met the rigorous just and reasonable standards of FPA Section 205.[92] As Basin admits in the *Basin II* Complaint, the ability of a Tri-State Member, such as NRPPD, to withdraw from its WESC is governed by Section 9 of the Eastern Interconnection WPC. Basin argues that the first sentence of Section 9 bars NRPPD's exit from Tri-State.[93] Section 9, however, is composed of three sentences, and the last two sentence must be parsed to fully understand the requirements of provision. Section 9 reads in its entirety:

> Tri-State shall not without the approval in writing of Seller, which approval shall not be unreasonably withheld, delayed or conditioned, take or suffer to be taken any steps for reorganization or to consolidate with or merge into any organization, or to sell, lease or transfer (or make any agreement therefore) all or a substantial portion of its assets, located in the Eastern Interconnection, whether now owned or hereafter acquired. Notwithstanding the foregoing, Tri-State may take or suffer to be taken any steps for reorganization or to consolidate with or merge into any corporation, or to sell, lease or transfer (or make any agreement therefore) all or a substantial portion of its assets, located in the Eastern Interconnection, whether now owned or hereafter acquired, so long as Tri-State shall pay such pro rata portion of the outstanding indebtedness, as well as other obligations and commitments of Seller at the time existing, as shall be determined by Seller and shall otherwise comply with such reasonable terms and conditions as Seller shall require. Notwithstanding the foregoing, no such approval shall be required to take the actions contemplated herein so long as the purchaser or surviving organization is a

---

[91]  *Basin II* Complaint ¶36.

[92]  16 U.S.C. § 824d.

[93]  *Basin II* Complaint ¶¶ 42-43.

member of Seller and has validly authorized, executed and delivered a contract for electric service substantially in the form of this Agreement.[94]

The second sentence of Section 9 begin with the phase "[n]otwithstanding the foregoing," which mandates that the second sentence of Section 9 overrides the first sentence. That is, the second sentence trumps or controls over whatever limitations are contained in the first.[95] As the United States Supreme Court has held, the effect of a "notwithstanding" clause will prevail "even if other provisions of the contract[ ] might seem to require . . . a [conflicting] result." *Cisneros*, 508 U.S. at 18-19.

The second controlling sentence then goes on to state how a CTP would be calculated if a Tri-State Member, such as NRPPD, exits without Basin's express permission: "Tri-State may take or suffer to be taken any steps…to sell, lease or transfer…all or a substantial portion of its assets, located in the Eastern Interconnection…so long as Tri-State shall pay such pro rata portion of the outstanding indebtedness, as well as other obligations and commitments of Seller at the time existing…." Thus the plain meaning of Section 9 allows NRPPD's exit if Tri-State pays a CTP equal to NRPPD's pro rata portion of Basin's outstanding indebtedness.[96]

The third sentence of Section 9 confirms that Basin approval is not required for NRPPD to be allowed to exit the Eastern Interconnection WPC. Once again it begins "[n]otwithstanding the forgoing," signaling this final sentence of Section 9 overrides the first two sentences of the Section. It goes on to state that "no such approval shall be required to take the actions

---

[94]  Eastern Interconnection WPC Section 9.

[95]  *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) (The "use of…a 'notwithstanding' clause…signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section"). *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 729-30 (S.D.N.Y. 1989) (contract provision containing language "notwithstanding any other provision" explicitly overrides contrary provision).

[96]  The second sentence ends with an additional requirement that Tri-State "shall otherwise comply with such reasonable terms and conditions as Seller shall require." As discussed below the Commission has rejected similar language in other exit provisions that give the seller unbridled discretion to set the exit fee. *Tri-State Generation and Transmission Ass'n, Inc.,* 175 FERC ¶ 61,114 at P. 52 (May 14, 2021).

contemplated herein so long as the purchaser or surviving organization is a member of Seller and has…a contract for electric service substantially in the form of this Agreement." It is undisputed that the surviving organization, that is, a reorganized Tri-State (*i.e.* Tri-State less NRPPD) is currently a member of Basin and has a valid contract with Basin for electric services.

Thus the plain meaning of Section 9 of the Eastern Interconnection WPC permits NRPPD to exit Tri-State via payment of a CTP equal to the pro rata portion of Basin's indebtedness without Basin's consent. Since Section 9 is an integral part of the Eastern Interconnection WPC, such a CTP would also comply with Section 8 of Basin's Bylaws, which require that "no Members shall be permitted to withdraw until it has met all its contractual obligations to the Cooperative."[97] Paying a CTP based on NRPPD's share of debt would meet all of these contractual obligations.

    2.   The Eastern Interconnection WPC's Section 9 is Substantially Different from the Termination Provisions of the Other Basin WPCs.

The termination provision in the Eastern Interconnection WPC must be contrasted with the termination provisions in the other Basin WPCs considered by the Commission upon Basin's becoming FERC-jurisdictional.[98] As the Commission noted in its Order regarding Basin's filed rates, "[e]ach Wholesale Power Contract includes termination provisions requiring notice of termination for the end of the contract term, which allows the Member to ensure that the contract does not remain in effect beyond 2050 or 2075, depending on the contract."[99] There is no similar

---

[97]  172 FERC ¶ 61,221 at P. 87.

[98]  172 FERC ¶ 61,221.

[99]  *See, e.g.*, FERC Rate Schedule No. 17, Wholesale Power Contract by and between Basin Electric Power Cooperative and Upper Missouri G. & T. Electric Cooperative, Inc., section 10:

    This Agreement shall remain in effect until December 31, 2075. If either Party desires to terminate the Agreement on December 31, 2075, it shall provide written notice of intent to terminate by December 31, 2070. If notice of termination is not received by either party prior to December 31,

provision in the Eastern Interconnection WPC. To the contrary, the termination provision contained in Section 9 allows withdrawal of a Tri-State asset upon payment of "pro rata portion of the outstanding indebtedness, as well as other obligations and commitments of Seller at the time existing…." Basin's limited interpretation of the Eastern Interconnection WPC should be rejected, as it fails to recognize the full extent of the contract's exit provisions for Tri-State Eastern Interconnection Members.

> 3. The Language of the Eastern Interconnection WPC is Consistent with the Commission's Adopted BSA CTP Methodology for Western Interconnection Members, and Results in a Just and Reasonable CTP for Eastern Interconnection Members.

The Adopted BSA, accepted by the Commission in the Tri-State Order, estimates a withdrawing Member's CTP as the Member's pro-rata share of Tri-State's debt through specified account numbers in Tri-State's FERC Form 1, plus any additional PPA costs not captured in that Form that have been incurred by Tri-State to serve that Member. The Member's pro-rata share of Tri-State's patronage capital and regulatory liabilities fund is then applied to the costs, creating the final CTP estimate.[100] The Commission applied this methodology to Western Interconnection Members in its Order, with a differing methodology applied to Eastern Interconnection Members, reflecting their pro-rata share of the PPAs that serve them.[101]

Despite the differing methodologies assigned to the Eastern and Western Interconnection Tri-State Members, the withdrawal language in the Eastern Interconnection WPC suggests that the Western Interconnection methodology is a more appropriate starting point to determine the "make whole" payment contemplated in the Eastern Interconnection WPC, Section 9. The

---

2070, this Agreement shall remain in effect unless terminated by either party giving to the other not less the five (5) years prior written notice of its intention to terminate.

[100] Exh. No. NPD-0010, Prepared Direct Testimony of Paul J. Hibbard on behalf of Northwest Rural Public Power District (Hibbard Direct) at 12:3-6, *citing* Tri-State Order at P. 580.

[101] Tri-State Order at P. 546; n.880.

PUBLIC VERSION

Adopted BSA aligns with the principles of cost causation and represents the incremental costs imposed on both Tri-State and Basin. The Adopted BSA represents a just and reasonable CTP approach for Eastern Interconnection Members, and is compatible with the Eastern Interconnection WPC's approach to make-whole payments as reflected in its Section 9.

Moreover, use of the Adopted BSA methodology would serve as a reasonable upper bound on a CTP calculated for an Eastern Interconnection Member. A CTP based on NRPPD's pro-rata share of the Eastern Interconnection WPC does not recognize that Basin has the ability to resell the energy and capacity that otherwise would have been used to serve NRPPD, and thus be "made whole" even without a payment from NRPPD.[102] Such an approach risks providing Basin with a double-recovery windfall.[103] Consequently, it is reasonable to determine that the Eastern Interconnection WPC does permit NRPPD to withdraw from Tri-State, contrary to Basin's claims. Should the Commission determine that Section 9 of the Eastern Interconnection WPC does allow NRPPD to exit Tri-State, the Adopted BSA methodology described above is a reasonable method to determine the make-whole fee to be paid to Tri-State by NRPPD.

NRPPD Witness Hibbard demonstrates that a CTP estimate made consistent with the Adopted BSA Method used for Western Interconnection Members results in an exit fee for NRPPD of $6.9 Million.[104] To do so, Mr. Hibbard estimates NRPPD's pro-rata share of Basin's balance sheet debt to determine costs using the information in Basin's FERC Form 1, then includes only Basin's non-transmission related debt in this calculation to prevent double recovery of costs.[105] He then calculates the credit side using NRPPD's pro-rata share of Basin's

---

[102] Exh. No. NPD-0010, Hibbard Direct at 14:12-15:9.

[103] *Id*. at 15:2-9.

[104] *Id*. at 16:12-15.

[105] *Id*. at 15:16-16:9.

patronage capital.[106] As demonstrated in Mr. Hibbard's testimony, this calculation produces a CTP estimate for NRPPD of $6.9 million, which is **[BEGIN CUI/PRIV]** [END CUI/PRIV] lower than the CTP proposed by Tri-State in its Compliance Filing.[107]

In addition to this calculation, Mr. Hibbard notes that Tri-State's estimated CTP fails to acknowledge credits due to NRPPD upon its exit. These credits include a pro rata share of Tri-State's patronage capital, allocations from NRPPD's WAPA contracts, NRPPD's pro rata share of Basin's Regulatory Liabilities pertaining to deferred revenues and deferred membership withdrawal incomes, and refunds potentially due to Tri-State as a result of Basin's ongoing Section 206 proceeding in Docket No. ER21-2441 et al.[108] In this proceeding, several Basin members have alleged that Basin has charged them unjust and unreasonable rates, and propose disallowances to Basin to remedy the issue.[109] If the Commission elects to order a refund to Basin members in that proceeding, NRPPD should receive its pro-rata share of Tri-State's refund on the grounds that NRPPD too was forced to pay inflated rates through its WESC with Tri-State.[110] Mr. Hibbard calculates that the value of NRPPD's additional credits, when added to his calculated CTP Payment, would result in an exit payment of essentially zero.[111]

---

[106] *Id.* at 16:8-9.

[107] *Id.* at 16:12-15.

[108] *Id.* at 17:5-18:8.

[109] *Id.* at 18:4-8, *quoting Basin Elec. Power Coop.*, Docket No. ER20-2441 et al., Order Requiring Supplemental Testimony on Financial Effects of Disallowance (Sept. 11, 2023) at P. 1.

[110] Exh. No. NPD-0010, Hibbard Direct at 18:11-14.

[111] *Id.* at 19:1-16.

**D. To the Extent the Eastern Interconnect WPC is Interpreted to Block NRPPD's Withdrawal from Tri-State, it is Unjust and Unreasonable.**

    1.  <u>NRPPD's Proposed Withdrawal From Tri-State Will Benefit, Not Harm Basin and Therefore any Exit Fee Amounts to a Windfall to Basin and is not Just and Reasonable.</u>

While regulators must set rates so that the utility has a reasonable opportunity to collect revenues and earn a reasonable return, (*Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of W. Va.*, 262 U.S. 679 (1923); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944)), rates that result in a windfall are not just and reasonable. *Belmont Municipal Light Dept. v. FERC* 38 F.4th 173 (DC Cir. 2022) (FERC acceptance of a rate without adequately considering whether it would result in windfall payments was arbitrary and capricious); *United Airlines, Inc. v. FERC*, 827 F.3d 122 (2016) (Double recovery of income tax allowance unjust and unreasonable); *ISO New Eng. Inc.*, 171 FERC ¶ 61,235 at P. 1 (Jun. 18, 2020) (Glick dissenting) ("Handing out money for nothing is a windfall, not a just and reasonable rate."); *Midwest Indep. Transmission Sys.*, 116 FERC ¶ 63,030 at P. 189 (Aug. 10, 2006) (Rates that "create[] a financial windfall for the utility" are unjust and unreasonable.), Since Basin is not financially harmed by NRPPD's exit from Tri-State – and, indeed, will benefit from NRPPD's exit, as discussed further below – any CTP would be, in Chairman's Glick's words, "[h]anding out money for nothing…not a just and reasonable rate." *ISO New Eng. Inc.*, 171 FERC ¶ 61,235 at P. 1

        i.  <u>Basin's Load Growth Projections Show that NRPPD's Exit will Not Harm Basin's Electric Power Sales.</u>

Basin anticipates needing significant new sources of energy and capacity in the near future to meet its growing load. As NRPPD Manager Chance Briscoe discusses in his testimony (attached hereto as Exhibit No. NPD-0001), Basin's load growth is projected to be robust through the next decade, and NRPPD represents a minimal part of Basin's current and projected

PUBLIC VERSION

load.[112] Further, Basin will easily be able to sell the power that would have been used to meet NRPPD's current load at the same rate to other customers.[113] As a result, in the event of NRPPD's withdrawal from Tri-State, Basin will be easily able to remarket the power that would have been used to meet all of NRPPD's load, will suffer no damage, and remain whole.[114] The fact that Basin will suffer no damages from NRPPD's exit is yet another reason why Eastern Interconnection WPC is unjust, unreasonable and unduly discriminatory under FPA §206.

Basin expects an annual increase in load that "dwarfs" the energy and power associated with the prospective loss of NRPPD.[115] For example, Basin expects annual average demand growth of 3.2% over the next ten years.[116] This level of annual demand growth – equivalent to approximately 150 MW of peak load growth – would exceed in under *three months* the peak load and annual energy requirements of NRPPD served under the Basin PPA.[117]

Under current circumstances, NRPPD's contribution to Basin's $140 million monthly revenue is about $500,000, representing a mere 0.36% of Basin's monthly revenue.[118] **[BEGIN CUI//PRIV]**



---

[112] Exh. No NPD-0001, Briscoe Direct at 4:8-16.

[113] *Id*.

[114] Exh. No. NPD-0010, Hibbard Direct at 14:12-15:9.

[115] *Id*. at 14:4-5.

[116] *Id*. at 14:5-6.

[117] *Id*. at 14:6-9.

[118] Exh. No. NPD-0001, Briscoe Direct at 7:1-11.

[119] *Id*., at 5:11-6:4.

[120] *Id*., at 6:1-2.



[END CUI//PRIV] NRPPD's contribution to Basin's monthly and annual energy load is insignificant especially compared to Basin's robust projected load growth.

Moreover, there is little, if any, excess capacity in the region to absorb Basin load growth – Southwest Power Pool (SPP) has recently submitted a filing which projects a declining reserve margin and a capacity shortfall by 2027, as discussed further below. Thus, Basin should be able to resell the energy and capacity that otherwise would have been used to meet NRPPD's demand to meet its expected growth in sales in less than a single year.[124]

2.  NRPPD's Exit from Tri-State would Provide Basin with Benefits, Particularly in the Current Market.

The reduction in peak demand and annual energy requirements associated with NRPPD's exit could in fact help Basin avoid, delay, or reduce its total costs to meet existing and forecasted demand. Assuming Basin charges this new load at prices equal to or above its Class A rates, then there would be no need for NRPPD to provide Basin a CTP equal to its pro rata share of outstanding generation-related debt, because Basin will be quickly "made whole" – if not benefit – via energy and power sales to new customers.

---

[121] *Id.*

[122] *Id.*, at 6:1-3.

[123] *Id.*, at 6:3-5.

[124] *Id.* at 8:13-9:8.

PUBLIC VERSION

In addition, reserve requirements actually render NRPPD's withdrawal from Tri-State beneficial to Basin. SPP recently increased its Planning Reserve Margin (PRM) from 12% to 15% in July 2022.[125] **[BEGIN CUI//PRIV]** █████████████████████████████ ████████████████████[126]**[END CUI//PRIV]** PRM is a metric used to determine estimated resource adequacy needed to meet projected peak demands. The percentage of PRM represents the amount of additional capacity a system requires over and above its projected peak demands.[127] *Id.* When a PRM is increased by an RTO, the utilities within that RTO must increase their generation capacity to meet the new PRM percentage by: 1) building new generation; 2) entering into purchase power agreement; or 3) reducing their load.[128] **[BEGIN CUI//PRIV]** ████████████████████████████████████████ ███████████████████.[129] ████████████████████████ ████████████████████████████████████████[130] ██ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████[131] **[END CUI//PRIV]**

On February 23, 2024, in Docket No. ER24-1317, SPP filed a tariff revision to implement (1) an Effective Load Carrying Capability (ELCC) accreditation methodology for wind resources, solar resources, and Electric Storage Resources (ESRs); and (2) a performance

---

[125] *See Southwest Power Pool Summary of Motions and Action Items*, July 26, 2022 at p. 6, *available at* https://www.spp.org/documents/67635/bod_mc%20minutes%202022%2007%2026.pdf.

[126] Exh. No. NPD-0001, Briscoe Direct at 8:2-4.

[127] *Id.*, at 7:16-21.

[128] *Id.*, at 8:4-6.

[129] *Id.*, at 8:7-8.

[130] *Id.*, at 8:7-9.

[131] *Id.*, at 8:9-12.

PUBLIC VERSION

based accreditation ("PBA") methodology for thermal and other conventional resources.[132] SPP stated that its existing accreditation methods for both variable energy resources and conventional resources do not fully and accurately reflect the actual performance of such resources and their true contribution to reliability and resource adequacy.[133] As a result, SPP proposes in this filing to reform its accreditation methods for both variable and conventional resource types. The proposed accreditation method will consider the historical performance of resources and their relative contributions to system reliability. If the proposal is accepted by the commission, it will result in the down-rating of many of the generation resources in SPP, including Basin's generators.[134] The result will be that Basin will have to increase its generation reserve capacity further to meet the its PRM percentage to account for the derating of its existing generators.[135]

Consequently Basin would be benefitted, not injured, by NRPPD's withdrawal from Tri-State, and therefore will suffer no damages. Basin's breach of contract claim is consequently inapposite, and should be rejected. *Vowers & Sons v. Strasheim*, 254 Neb. 506, 516, 576 N.W.2d 817, 825 (1998) ("As a general rule, a party may not have double recovery for a single injury, or be made 'more than whole'" by compensation which exceeds the actual damages sustained."(citing 25 C.J.S. Damages § 3 at 628 (1966)); *Hildreth Consulting Eng'rs, P.C. v. Larry E. Knight, Inc.*, 801 A.2d 967, 972 (D.C. 2002) ("Damages may be awarded only when the party claiming them has adequately demonstrated that the opponent's breach caused the harm suffered").

---

[132]    Exh. No. NPD-0001, Briscoe Direct at 8:13-19; *Southwest Power Pool, Inc.*, Docket No. ER4-1317, Submission of Tariff Revisions to Implement Effective Load Carrying Capability Methodology and Performance Based Accreditation (Feb. 23, 2024).

[133]    Exh. No. NPD-0001, Briscoe Direct at 8:19-9:1.

[134]    *Id*. at 9:4-6.

[135]    *Id*. at 9:6-8.

3. NRPPD's Exit from Tri-State would Have Minimal or No Effect on Basin's Quantitative Credit Rating Metrics and Creditworthiness

In its *Basin II* Complaint, Basin asserts that "If not for the WPC and WESC system, credit rating agencies would assign much lower ratings to Basin than they presently do, and Basin would be forced to pay much higher interest on its debt, if it could secure debt financing at all."[136] It further asserts that one way in which it would be harmed by NRPPD's withdrawal is through "potential downgrades of Basin's credit ratings resulting in additional debt service costs.[137]" These assertions are both highly speculative and incorrect.

In reality, any impact from NRPPD's withdrawal from Tri-State, or even from the withdrawal *every* Eastern Interconnection member from Tri-State, would be minimal. There are multiple reasons for this. First, NRPPD represents a miniscule portion of Basin's total load – only **[BEGIN CUI//PRIV]** ███ **[END CUI//PRIV]** of Basin's load.[138] Even if all of Tri-State's Eastern Interconnection load is withdrawn from Tri-State (and thus from Basin), such withdrawal would represent only 2.4% of Basin's load.[139]

Second, all members who exit Tri-State will do so by paying an exit fee pursuant to the Adopted BSA. If the Adopted BSA approach generated an inappropriately small exit fee for departing members, then the credit rating agencies that rate Tri-State's debt would have been expected to significantly downgrade Tri-State's credit ratings following both the September 2022 Initial Decision by FERC and the Tri-State Order.[140] That did not happen. While there have been

---

[136] *Basin II* Complaint, ¶ 128.

[137] *Id.*, ¶ 133.

[138] Exh. No. NPD-0015, Prepared Direct Testimony of R. Jeffrey Malinak on behalf of Northwest Rural Public Power District (Malinak Direct) at 8:3-8.

[139] *Id.*

[140] *Id.* at 15:19-22.

some minimal reductions in the last 18 months, Tri-State remained at investment grade ratings.[141] The factors cited by both S&P and Moody's involved factors other than the ongoing efforts of members to exit Tri-State.[142] By extension, given that Tri-State is but a single digit percentage of Basin's business, any impact from the departure of Tri-State members would have even less of an impact of Basin's credit rating.

Third, no credit rating agency has taken any action to downgrade Tri-State or Basin's debt since the December 2023 FERC Order.[143] In fact, no credit rating agency has even issued a report on Tri-State or Basin's debt since the December 2023 FERC Order, despite the fact that the December 2023 FERC Order cemented the use of a BSA method for calculating exit fees.[144] Consequently, Basin's claims regarding its credit rating are overstated and should be ignored.

4. The Doctrine of Impossibility of Performance Excuses Tri-State's Performance of the Eastern Interconnection WPC, Precluding any Claim of Breach.

Prior to Tri-State becoming FERC jurisdictional and filing its CTP proceeding under FPA Section 205, there was no general right for its members to exit Tri-State under objective conditions. Upon filing its Modified CTP Methodology in April 2021, Tri-State proposed a revised set of bylaws that would have given the Tri-State Board of Directors complete, absolute and unreviewable discretion to impose whatever onerous conditions it determined, irrespective of whether such conditions were just and reasonable. As noted above, the Commission rejected this provision as not just and reasonable.[145] Over the course of multiple CTP-related proceedings, the

---

[141]  *Id*. at 15:22-16:7.

[142]  *Id.* at 16:7-18:10.

[143]  *Id.* at 18:11-19:6.

[144]  *Id.* at 19:7-10.

[145]  175 FERC ¶ 61,114 at P. 52.

Commission determined that it was just and reasonable to recognize Members' right to exit Tri-State by paying a CTP as determined in the Tri-State Order.

NRPPD maintains that Section 9 of Eastern Interconnection WPC gives it the ability to exit Tri-State without a breach of the Eastern Interconnection WPC. However, to the extent the Commission determines that, prior to its issuance of the Tri-State Order, NRPPD's withdrawal may have amounted to a breach of the Eastern Interconnection WPC, the doctrine of impracticability of performance would excuse Tri-State's failure to prevent NRPPD's withdrawal from its membership, and thus no breach of contract would occur.

The Nebraska Supreme Court,[146] adopting the Restatement 2d of Contracts §§ 261-264, has stated that "a contractual duty or a duty to make compensation is discharged…where performance is subsequently prevented or prohibited by a judicial, executive or administrative order." *Kuhl v. School Dist.*, 155 Neb. 357, 366 (1952); *Armstrong v. Clarkson Coll.*, 297 Neb. 595, 620 (2017) ("The doctrine of impossibility of performance, often now called impracticability of performance, excuses, a promisor's failure to perform a duty under a contract where performance has been rendered severely impracticable or impossible by unforeseen circumstances"); *Turbines Ltd. v. Transupport, Inc*., 285 Neb. 129 (2013) (superseding law may render performance impracticable and therefore discharge the promisor of that duty, but declining to apply the doctrine to this case because the promisor's contractual obligations had already been "fulfilled.") The Tri-State Order permitting withdrawal discharges Tri-State from any contractual duty to Basin to prevent NRPPD exit under the Eastern Interconnection WPC under the impracticability doctrine.

---

[146]   The Eastern Interconnection WPC is governed by Nebraska law.

Though Nebraska case law on the doctrine of impracticability is limited, the Nebraska Supreme Court's construal of the doctrine has exclusively relied on sections 261-264 of the Restatement 2d of Contracts, which has been adopted and applied by courts of many other jurisdictions in analogous cases. For example, the Tenth Circuit, applying New Mexico law, held that under § 264 a buyer that was party to a contract (in that case, a take-or-pay contract with a force majeure provision) had not breached the contract because its performance was made impracticable by a supervening governmental regulation. *Int'l Minerals & Chemical Corp. v. Llano, Inc.*, 770 F.2d 879, 886 (10th Cir. 1985). The Supreme Court of Wyoming has likewise held, in a case similar to the instant case, that "when the agency charged with the responsibility for oil and gas conservation issues an order which conflicts with contractual provisions, the agency order supersedes or supplements the contractual provisions." *Union Pac. Res. Co. v. Texaco*, 882 P.2d 212, 226 (Wyo. 1994). *See also Glickman v. Coakley*, 22 Ohio App. 3d 49, 52 (Ohio Ct. App. 1984) ("Absent contrary contractual terms, either party can often avoid an agreement when governmental activity renders its performance impossible or illegal"); *Landis v. Hodgson*, 109 Idaho 252 (Idaho Ct. App. 1985) (holding that Defendant was not liable for any non-performance of a contract after government action rendered performance impracticable). This universally adopted logic applies in this case. A supervening governmental regulation (the Commission's Tri-State Order) has made performance of the Eastern Interconnection WPC impossible. In other words, to the extent the Tri-State Order conflicts with an Eastern Interconnection WPC provision, the Tri-State Order supersedes or supplements the contractual provisions.

There are three general requirements for the application of the doctrine of impracticability of performance: "(1) the occurrence (or nonoccurrence) of the event causing the

impracticability was unexpected; (2) performance of the duty by the promisor would be extremely difficult and burdensome, if not impossible; and (3) the promisor did not assume the risk of the event's occurrence (or nonoccurrence)." *Armstrong, 297 Neb.* at 621. As to the first and third requirements, the Restatement advises that "if the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." Therefore pursuant to the Restatement, the Tri-State Order's change in the law must be assumed to be unexpected at the time of contracting, and nothing in the Eastern Interconnection WPC suggests that Tri-State assumed the risk of such an occurrence.

The second requirement, which speaks to the definition and extent of impracticability or impossibility, asks "whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract."[147] Courts have made the important distinction that a party cannot invoke the doctrine of impracticability to excuse its non-performance if that party "cause[d] or collude[d] in inducing the governmental action preventing [its] performance."[148]

In the instant proceeding, Tri-State requested that the Commission accept its proposal to allow veto power over a Member's exit and was rejected. As noted above, Tri-State attempted to retain such veto power when it filed its proposed Board Policy 125 in Docket No. ER21-1449, which contained a provision giving its Board of Directors absolute veto power over any

---

[147] *Int'l Minerals & Chemical Corp.*, 770 F.2d at 886.

[148] *Id*. at 887.

Member's exit. As Basin admits, it was the Commission that rejected Tri-State's filing, and ordered that such veto power was unjust and unreasonable.[149]

When Tri-State first proposed its Modified CTP and Board Policy 125, it did so with the full intention of maintaining its Board's veto power over Member exits. Basin admits as much in the Basin II complaint.[150] Thus, Tri-State did not cause or induce the government action that currently prevents its performance under the Eastern Interconnection WPC because it initially proposed that veto power could be exercised over its Member's exits, only for this argument to be rejected by the Commission. The doctrine of impracticability shields Tri-State to the extent that the Commission's determines that its mandate conflicts with the Eastern Interconnection WPC.[151]

> 5. <u>Preventing Tri-State from Fully Complying with a FERC Order is Unjust and Unreasonable because it would Violate Several Regulatory Principles.</u>

Permitting a contract like the Eastern Interconnection WPC to prevent a public utility like Tri-State from complying with the directives of a Commission order is an unjust, unreasonable, and unduly discriminatory and preferential result. As NRPPD Witness Dr. Susan Tierney states in her testimony, such a result would violate several regulatory principles "that together are critical to the Commission's" statutory mandate to ensure that a public utility's rates, terms and conditions are just and reasonable.[152] Those principles are as follows: 1) the principles of administrative efficiency and effectiveness of a regulated entity's ability to implement rates

---

[149] *Basin II* Complaint at ¶ 56.

[150] *Id*. at ¶ 73.

[151] Exh. No. NPD-0008, Tierney Direct at 13:14-15:16.

[152] *Id*.at 4:12-18.

ordered by the Commission; 2) the fairness principle; 3) the principle of supporting wholesale competition; and 4) the do-no-harm principle.[153]

i.    Administrative Efficiency and Effectiveness.

The principle of administrative efficiency and effectiveness ensures both the substantive design of the economic regulation of public utilities and the efficiency with which regulated entities can act upon the directives contained in regulatory decisions in order to accomplish their intended purpose.[154] The relation of this principle to NRPPD's request is quite clear. Basin's claim that the Eastern Interconnection WPC precludes Tri-State's compliance with the Tri-State Order actively delays Tri-State's ability to provide its Eastern Interconnection Members with a just and reasonable CTP, and prevents Tri-State from allowing its Eastern Interconnection Members from withdrawing Tri-State on just and reasonable terms.[155] Basin's actions further exacerbate the already unjust and unreasonable terms of the Eastern Interconnection WPC, because Basin has now claimed the same veto power over a Member exit that was previously rejected by the Commission as unjust and unreasonable.[156] Affirmation of Basin's position would directly contradict the Commission's prior order, thus resulting in an inconsistent and illogical outcome.[157]

---

[153]  *Id*. at 4:15-18.

[154]  *Id*. at 15:19-16:22.

[155]  *See Tri-State Generation and Transmission Ass'n., Inc.*, Docket No. ER21-2818 et al., Compliance Filing (Jan. 25, 2024). In its Compliance Filing, Tri-State included provisions in its proposed Tariff language stating that no Eastern Interconnection Members may withdraw if a court or other authority issued an injunction against withdrawal, or found that such withdrawal would breach the Eastern Interconnection WPC. Not only is such a provision unjust and unreasonable on its face because it institutes a barrier not faced by Tri-State's Western Interconnection Members, but also improperly cedes the FERC's statutory jurisdiction over public utility filed rates to other venues.

[156]  175 FERC ¶ 61,114 at P. 52.

[157]  Exh. No. NPD-008, Tierney Direct at 17:11-18:7.

PUBLIC VERSION

      ii.    Fairness.

The fairness principle is a bedrock principle of ratemaking, and the foundation of the requirement that a regulator must only approve rates that are just and reasonable, and not unduly discriminatory or preferential.[158] The Commission's Tri-State Order demonstrably relied on the fairness principle when it determined the appropriate CTP Methodology used for both Eastern and Western Interconnection Members by determining that although all Tri-State Members must be treated the same, any CTP calculation must take their situational differences into account. However, the Eastern Interconnection WPC has impacted the ability of both the Commission and the impacted parties to adhere to this principle with regard to Eastern Interconnection Member exits.

As an initial matter, Basin's argument that the terms of the Eastern Interconnection WPC effectively stop Eastern Interconnection Members is discriminatory, because it gives preferential treatment to Tri-State's Western Interconnection Members without a reasonable purpose.[159] Despite the Tri-State Order's conclusion that all Tri-State Members have the right to withdraw from Tri-State, the Eastern Interconnection WPC blocks Eastern Interconnection Member withdrawal simply because they receive power under a third-party contract that those Members had no hand in either negotiating nor executing.[160] This fundamental unfairness was transferred to Tri-State's Rate No. 281, in which Tri-State has attempted to codify this discriminatory treatment, and consequently gave outside authorities the ability to block Eastern Interconnection Member withdrawal entirely. As a jurisdictional public utility, Tri-State is obligated to provide its Members with rates, terms, and conditions that are just and reasonable, which includes

---

[158]  16 U.S.C. § 824d.

[159]  Exh. No. NPD-0008, Tierney Direct at 17:14-18:4.

[160]  *Id*. at 18:5-10.

adhering to the policy of fairness. The Commission has recognized and established parameters to remedy Tri-State's disparate treatment of Eastern Interconnection Members in other Tri-State proceedings,[161] and NRPPD respectfully requests that the Commission do so here.

iii.    Wholesale Competition

FERC has a long-established national policy of encouraging and fostering competition in wholesale power markets.[162] Tri-State's long-term Members, however, have been denied the ability to participate in a competitive power market due to their long-term WESCs that have "locked" them into obtaining power from a single source rather than seeking to obtain power at more competitive prices. Now, because the Commission issued its Tri-State Order that allows Tri-State Members to withdraw, they have gained the ability to participate in the wholesale power market and obtain wholesale electricity at lower prices. Basin's interpretation of the Eastern Interconnection WPC, however, subverts NRPPD's ability to seek its supply elsewhere.

As demonstrated above, Basin will not be harmed by NRPPD's exit from Tri-State. However, Basin has already asserted its contract claims to try to prevent NRPPD from entering the competitive electricity market. On August 23, 2022, Nebraska Public Power District (NPPD) issued a letter to NRPPD expressing that it was willing and able to provide NRPPD energy and power.[163] On November 13, 2023, NRPPD and NPPD issued a joint press release stating that each of their respective Boards of Directors had approved NPPD to provide energy and power to NRPPD beginning May 1, 2024.[164] However, Basin has exerted its purported contract claim to the SPP and, as a result, has blocked the assignment of NPPD (through The Energy Authority, or

---

[161] *See Tri-State Generation and Transmission Ass'n., Inc*., 186 FERC ¶ 61,183 (Mar. 15, 2024) at P. 130.

[162] Exh. No. NPD-0008, Tierney Direct at 19:7-20:2, *quoting Wholesale Competition in Regions with Organized Elec. Mkts.*, 119 FERC ¶ 61,306 (June 22, 2007) (Advanced Notice of Proposed Rulemaking) at P. 4.

[163] Exh. No. NPD-0002, Aug. 23, 2022 Letter from NPPD to NRPPD.

[164] Exh. No. NPD-0003, Nov. 13, 2023 Joint Press Release from NRPPD and NPPD.

TEA) as the Market Participant (MP) for NRPPD. Basin has precluded this move even though Tri-State has indicated to SPP that this transfer should occur.[165] Without this change of assignment, NPPD cannot enter into a contract with NRPPD to supply its energy needs that have been in the works since August of 2022. While NRPPD still has time to complete its exit from Tri-State, if the Commission acts by April 29, 2024 as requested, NRPPD's prudent planning during the two-year notice period has already been frustrated in securing new power supply from NPPD by Basin's actions.

Essentially, Basin's attempt to re-lock Eastern Interconnection Members by claiming that the Eastern Interconnection WPC prevents their ability to withdraw from Tri-State has actively harmed NRPPD. Because Basin's actions run counter to the FERC's attempts to encourage a proper balance of regulation and competition, Basin's interpretation that the Eastern Interconnection WPC blocks NRPPD's exit from Tri-State should be rejected.[166]

iv.    Do No Harm.

As discussed above, NRPPD's withdrawal from Tri-State will not cause harm to Basin for several reasons. NRPPD is a miniscule part of Basin's overall load and its withdrawal would not have a significant impact on Basin's finances. Basin has predicted significant load growth in the future, it has the ability to re-market its load to its other customers. Consequently, and despite Basin's claim, NRPPD's withdrawal from Tri-State would not contravene the Commission's do-no-harm principle. Rather, Basin's insistence that NRPPD cannot withdraw from Tri-State causes harm to NRPPD, because it is prevented from seeking to buy power in the competitive market.

---

[165]  Exh. No. NPD-0004, Nov. 27, 20223 Letter from Tri-State to SPP; Exh. No. NPD-0005, Dec. 4, 2023 Letter from Basin to SPP.

[166]  Exh. No. NPD-0008, Tierney Direct at 20:12-19.

As NRPPD Witness Briscoe discusses in his Direct Testimony, NRPPD currently has a monthly revenue of approximately $800,000, and its intent to change its energy supplier from basin to NPPD would save NRPPD approximately $100,000 per month on expenses.[167] This, in turn, would reflect a cost savings to NRPPD's customers of approximately $1.2 million per year.[168] Loss of this opportunity would harm both NRPPD and its customers far more than it would harm either Tri-State or Basin, particularly when taking into account that, should NRPPD withdraw from Tri-State and be required to return, NRPPD would require only minimal load management studies and infrastructure changes, and thus minimal costs, to return to such an agreement.[169] Thus, NRPPD's withdrawal from Tri-State is the only appropriate result of this proceeding under the do-no-harm principle, and the Commission should determine that NRPPD's withdrawal is just and reasonable, and not prevented by the Eastern Interconnection WPC.

### E. Basin and Tri-State must Refund NRPPD for Consistent Overcharging of Tri-State Members.

The Eastern Interconnection WPC set forth the elements of the rate Basin can charge Tri-State for energy: Article 6.C states that the rate for such energy:

> . . . shall produce revenues which shall be sufficient, but only sufficient, with the revenues of Seller from all other sources, to meet the cost of the operation and maintenance (including, without limitation, replacement, insurance, taxes and administrative and general overhead expenses) of the generating plants, the transmission system and related facilities of Seller, the cost of any power and energy purchased for resale hereunder by Seller, the cost of transmission service, the cost of lease payments, interest expense and depreciation expense or principal repayments of Seller, and to provide for the establishment and maintenance of reasonable reserves.

---

[167]   Exh. No. NPD-0001, Briscoe Direct at 9:11-15.

[168]   *Id*.

[169]   *Id*. at 9:15-19.

Specifically, the contractual rate formula does not allow Basin to charge for the cost of non-utility business such as the losses on Basin's Urea facility. Yet, since the inception of the Eastern Interconnection WPC Basin has been charging Tri-State for such loses and Tri-State has been passing on such *ultra vires* charges to its members, including NRPPD in violation of contract.

Tri-State has violated its fiduciary duty to its members by not enforcing the terms of the Eastern Interconnection WPC and insisting that Basin remove these extra-contract charges from its invoices. Tri-State has no incentive to enforce the letter of the agreement with Basin, because Tri-State is able to pass these illegal costs to it members in both the Eastern and Western Interconnections. Only the end-use customers of Tri-State's members suffer through higher retail electric costs.

**F.    The CTP Developed in the Tri-State Order for Eastern Interconnection Customers Must Conform to the Commission Findings Related to this Complaint.**

To the extent that the Commission determines that NRPPD's withdrawal from Tri-State requires a payment from Tri-State to Basin that is different from the CTP estimate calculated pursuant to the terms of the Tri-State Order, NRPPD respectfully requests that the Commission amend the Tri-State Order to reflect the method of calculating the new CTP for Tri-State's Eastern Interconnection Members.

**V.    REQUEST FOR FAST-TRACK PROCESSING**

Pursuant to Rule 206(h) of the Rules of Practice and Procedure of the Commission,[170] NRPPD respectfully requests fast track processing of its Complaint against Basin and Tri-State, and requests that the Commission issue a decision no later than April 29, 2024. Two years prior on April 29, 2022, NRPPD submitted its notice of intent to withdraw from the WESC and from

---

[170]    18 C.F.R. § 385.206 (2024).

**PUBLIC VERSION**

Tri-State membership, effective May 1, 2024.[171] This notice was submitted pursuant to the withdrawal procedures set forth in two Commission Orders issued in consolidated Docket Nos. ER21-2818 and EL22-4 on October 29, 2021[172] and April 21, 2022,[173] respectively. The October 29, 2021 Order states that "in order to terminate its WESC and membership in Tri-State, a utility member must (1) provide a two-year advance notice of its intent to withdraw from Tri-State and (2) pay its CTP to Tri-State on the date of withdrawal, as calculated pursuant to the Modified CTP Methodology."[174] The April 21, 2022 Order further clarifies that a utility-member's notice to withdraw is unconditional and cannot be retracted, particularly because the two-year notice period "is intended to provide planning certainty for both the withdrawing utility member *and* Tri-State and its remaining utility members."[175] Accordingly, it would prejudice both NRPPD and Tri-State if NRPPD were to pay its CTP on May 1, 2024, pursuant to the withdrawal notice and relevant procedures, without knowing the outcome of the proceedings that will determine its ability to withdraw.

## VI.    RULE 206 REQUIREMENTS

### 1.    Action or Inaction Alleged to Violate Statutory Standards:

Basin is attempting to prevent Tri-State's performance of the directives in Commission Order 185 FERC ¶ 61,201 (Dec. 19, 2023) by precluding NRPPD from withdrawing from Tri-State pursuant to the terms of that Order. Tri-State has submitted tariff provisions that permit preclusion of Eastern Interconnection Members from withdrawing from Tri-State.

---

[171] *Tri-State Generation and Transmission Ass'n., Inc.*, Docket No. ER21-2818, Notice to Withdraw of Northwest Rural Public Power District (April 29, 2022).

[172] Hearing Order at P. 1..

[173] *Tri-State Generation and Transmission Ass'n., Inc*., 179 FERC ¶ 61,052 (Apr. 21, 2022).

[174] Hearing Order at P. 121.

[175] 179 FERC ¶ 61,052 at P. 39.

### 2. Explanation of How the Action or Inaction Violates such Standards:

Basin's attempt to obtain a preliminary injunction preventing NRPPD's withdrawal from Tri-State from a Federal District Court is a collateral attack on the Tri-State Order and the Commission's jurisdiction over Public Utility Filed Rates. Tri-State's proposed Rate No. 281 terms providing adjudicative entities other than the Commission veto power over NRPPD's withdrawal is unjust, unreasonable, and unduly discriminatory and preferential.

### 3. Business, Commercial, Economic or Other Issues Presented by the Action or Inaction:

If NRPPD is prevented from exercising its right to withdraw from Tri-State, it is prevented from seeking power sources in the competitive power market.

### 4. Financial Impact or Burden on Complainant:

Basin and Tri-State's actions would prevent NRPPD from seeking power sources at lower prices than those it currently pays to Tri-State.

### 5. Practical, Operational or Other Non-Financial Impacts:

Basin and Tri-State's actions force NRPPD to pay a rate that is unjust, unreasonable, and unduly discriminatory and preferential. Further, Basin and Tri-State seek to subvert the Commission's jurisdiction over public utility filed rates as set forth in the FPA.

### 6. Other Pending Proceedings and Explanation why Timely Resolution Cannot be Achieved in that Forum:

NRPPD is protesting this issue in Dockets No. ER21-2818 et. al, however, the specific actions prompting this Complaint are not before the Commission in that proceeding. Basin further has filed suit in Federal District Court, which does not have jurisdiction over these matters pursuant to the FPA. NRPPD requests that the Commission exercise its jurisdiction in order to resolve the instant matter.

### 7.  Specific Relief Requested:

NRPPD respectfully request that the Commission: 1) institute a Section 206 proceeding and exercise primary jurisdiction over the interpretation of the Tri-State Order and Eastern Interconnection WPC; 2) hold that NRPPD's withdrawal from Tri-State is permissible under the Eastern Interconnection WPC3) hold that the Adopted BSA CTP calculation as determined by NRPPD Witness Hibbard is the appropriate methodology to determine NRPPD's exit fee or, in the alternative, find that the Eastern Interconnection WPC is not just and reasonable to the extent it is found to bar the Commission from fully implementing the Tri-State Order by preventing NRPPD's orderly withdrawal from Tri-State.

To the extent that the Commission, after interpreting the Eastern Interconnection Agreement determines that NRPPD's withdrawal from Tri-State requires a payment from Tri-State to Basin that is different from the CTP found to be just and reasonable in the Tri-State Order, NRPPD respectfully requests that the Commission amend the Tri-State Order to reflect the new CTP.

### 8.  Documents in Support of Complaint:

NRPPD submits the following documents in support of its Complaint:

- NPD-0001: Direct Testimony of C. Briscoe (CUI//PRIV and Public Versions);

- NPD-0002: Aug. 23, 2022 Letter from NPPD to NRPPD;

- NPD-0003: Nov. 13, 2023 Joint Press Release from NRPPD and NPPD;

- NPD-0004: Nov. 27, 20223 Letter from Tri-State to SPP;

- NPD-0005: Dec. 4, 2023 Letter from Basin to SPP;

- NPD-0006: Dec. 4 Letter from Basin to The Energy Authority;

- NPD-0007: Orrick, Harrison & Sutcliffe LLP Letter to Tri-State;

- NPD-0008: Direct Testimony of S. Tierney;

- NPD-0009: CV of S. Tierney;

- NPD-0010: Direct Testimony of P. Hibbard (CUIV//PRIV and Public versions);

- NPD-0011: CV of P. Hibbard;

- NPD-0012: Workpapers of P. Hibbard (CUI//PRIV);

- NPD-0013: Eastern Interconnection WI;

- NPD-0014: Tri-State CTP Filing Attachment D (CUI//PRIV);

- NPD-0015: Direct Testimony of R. J. Malinak (CUI//PRIV and Public Versions);

- NPD-0016: CV of R. J. Malinak;

- NPD-0017: Tri-State and Basin Credit Rating Histories;

- NPD-0018: Rate Schedule FERC No. 24;

- NPD-0019: Workpapers of R. J. Malinak;

- NPD-0020: Jan. 16, 2024 Letter from Frederick J. Bauman to Lisa T. Simpson and Nicole A. Travers; and

- NPD-0021: Jan. 19, 2024 Letter from Lisa T. Simpson to Frederick J. Baumann and Nicole A. Travers.

**9. Enforcement Hotline, Dispute Resolution Services, Tariff-Based Dispute Resolution Mechanisms or other Informal Procedures:**

Given that the issues raised in this Complaint have been brought before the Commission and have been subject to hearing procedures for several years, as well as being brought before a Federal District Court, and further given Basin's refusal to negotiate pursuant to the terms of the Commission's Tri-State Order, pursuing tariff-based or other informal dispute resolution would not be an effective means of resolving this dispute.

**10. Whether ADR could Successfully Resolve the Complaint:**

See response above.

PUBLIC VERSION

**11. Form of Notice:**

See Attachment A hereto.

**VII.     CONCLUSION**

For the foregoing reasons, NRPPD requests that the Commission institute a Section 206

proceeding in order to determine the impact of the Eastern Interconnection WPC on the Tri-State

Order.

<div align="right">

Respectfully Submitted,

*Richard M. Lorenzo*
Richard M. Lorenzo
Nicole A. Travers
Loeb & Loeb LLP
901 New York Avenue NW
Suite 300E
Washington, DC 20001
(202) 618-5000
rlorenzo@loeb.com
ntravers@loeb.com

</div>

March 25, 2024

<div align="right">

*Attorneys for Northwest Rural Public Power District*

</div>

# ATTACHMENT A

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Northwest Rural Public Power District | ) | |
| Complainant | ) | |
| | ) | Docket No. EL24-____-000 |
| v. | ) | |
| | ) | |
| Basin Electric Power Cooperative | ) | |
| and | ) | |
| | ) | |
| Tri-State Generation and Transmission | ) | |
| Association, Inc. | ) | |
| | ) | |
| Respondents | ) | |

**NOTICE OF COMPLAINT**

**( _____ )**

Take notice that on March 25, 2024, Northwest Rural Public Power District (NRPPD) filed a formal Complaint against Basin Electric Power Cooperative (Basin) and Tri-State Generation and Transmission Association, Inc. (Tri-State), pursuant to sections 206, 306, and 309 of the Federal Power Act (FPA), 16 U.S.C. §§ 824e, 825e, and 825h, and Rule 206 of the Federal Energy Regulatory Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.206.

NRPPD has also filed a motion to: (1) expedite consideration of the Commission's decision to institute a proceeding pursuant to Section 206 of the FPA; and (2) shorten the period for respondents to answer NRPPD's Petition from 30 days to 15 day and a Request for Fast Track Processing.

NRPPD asserts that Basin and Tri-State have acted in an unjust, unreasonable and unduly discriminatory and preferential manner, and contrary to the public interest by attempting to prevent NRPPD from orderly withdrawal from its Tri-State Membership, contrary to the directives of the Commission as issued in Commission Order 185 FERC ¶ 61,201 (December 19, 2023).

NRPPD certifies that copies of the Complaint have been served on the contacts for Basin and Tri-State as listed on the Commission's list of Corporate Officials.

238473718.2

Any person desiring to intervene or to protest this filing must file in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. §§ 385.211 and 385.214. Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make protestants parties to the proceeding. Any person wishing to become a party must file a notice of intervention or motion to intervene, as appropriate. Respondents' answers and all interventions or protests must be filed on or before the comment date. The Respondent's answer, motions to intervene, and protests must be served on the Complainants.

The Commission encourages electronic submission of protests and interventions in lieu of paper using the "eFiling" link at http://www.ferc.gov. Persons unable to file electronically should submit an original and 5 copies of the protest or intervention to the Federal Energy Regulatory Commission, 888 First Street, NE, Washington, DC 20426.

This filing is accessible on-line at http://www.ferc.gov, using the "eLibrary" link and is available for review in the Commission's Public Reference Room in Washington, DC.    There is an "eSubscription" link on the web site that enables subscribers to receive email notification when a document is added to a subscribed docket(s). For assistance with any FERC Online service, please email FERCOnlineSupport@ferc.gov, or call (866) 208-3676 (toll free). For TTY, call (202) 502-8659.

Comment Date:  5:00 pm Eastern Time on ( _____ ).

Debbie-Anne A. Reese,
Acting Secretary, Office of the Secretary

# ATTACHMENT B

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Northwest Rural Public Power District | ) | |
| Complainant | ) | |
| | ) | Docket No. EL24-___-000 |
| v. | ) | |
| | ) | |
| Basin Electric Power Cooperative | ) | |
| and | ) | |
| | ) | |
| Tri-State Generation and Transmission | ) | |
| Association, Inc. | ) | |
| | ) | |
| Respondents | ) | |

PROTECTIVE ORDER

(Issued          )

1.      Participants in this proceeding(s) may exchange documents or materials that are deemed to contain Privileged Material and/or Critical Energy/Electric Infrastructure Information (CEII), as those terms are defined herein.  Accordingly, IT IS ORDERED THAT this Protective Order shall govern the use of all such material produced by, or on behalf of, any Participant in the above-captioned proceeding(s).

2.      The Commission's regulations[1] and its policy governing the labelling of controlled unclassified information (CUI),[2] establish and distinguish the respective designations of Privileged Material and CEII.  As to these designations, this Protective Order provides that a Participant:

    A.      *may* designate as Privileged Material any material which customarily is treated by that Participant as commercially sensitive or proprietary or material subject to a legal privilege, which is not otherwise available to the

---

[1] *Compare* 18 C.F.R. § 388.112, *with* 18 C.F.R. § 388.113.  This Protective Order does not alter the respective requirements imposed by these sections on Privileged Material or CEII.

[2] *Notice of Document Labelling Guidance for Documents Submitted to or Filed with the Commission or Commission Staff*, 82 Fed. Reg. 18,632 (Apr. 20, 2017) (issued by Commission Apr. 14, 2017).

Docket No. ER24-_____-000                                              - 2 -

public, and which, if disclosed, would subject that Participant or its customers to risk of competitive disadvantage or other business injury; and

B.    *must* designate as CEII, any material that meets the definition of that term as provided by 18 C.F.R. §§ 388.113(a), (c).

3.    For the purposes of this Protective Order, the listed terms are defined as follows:

A.    Participant(s):  As defined at 18 C.F.R. § 385.102(b).

B.    Privileged Material:[3]

   i.    Material (including depositions) provided by a Participant in response to discovery requests or filed with the Commission, and that is designated as Privileged Material by such Participant;[4]

   ii.   Material that is privileged under federal, state, or foreign law, such as work-product privilege, attorney-client privilege, or governmental privilege, and that is designated as Privileged Material by such Participant;[5]

---

[3] The Commission's regulations state that "[f]or the purposes of the Commission's filing requirements, non-CEII subject to an outstanding claim of exemption from disclosure under FOIA will be referred to as privileged material."  18 C.F.R. § 388.112(a).  The regulations further state that "[f]or material filed in proceedings set for trial-type hearing or settlement judge proceedings, a participant's access to material for which privileged treatment is claimed is governed by the presiding official's protective order." 18 C.F.R. § 388.112(b)(2)(v).

[4] *See infra* P 11 for the procedures governing the labeling of this designation.

[5] The Commission's regulations state that "[a] presiding officer may, by order . . . restrict public disclosure of discoverable matter in order to . . . [p]reserve a privilege of a participant. . . ." 18 C.F.R. § 385.410(c)(3).  To adjudicate such privileges, the regulations further state that "[i]n the absence of controlling Commission precedent, privileges will be determined in accordance with decisions of the Federal courts with due consideration to the Commission's need to obtain information necessary to discharge its regulatory responsibilities." 18 C.F.R. § 385.410(d)(1)(i).

iii.   Any information contained in or obtained from such designated material;

iv.   Any other material which is made subject to this Protective Order by the Presiding Administrative Law Judge (Presiding Judge) or the Chief Administrative Law Judge (Chief Judge) in the absence of the Presiding Judge or where no presiding judge is designated, the Federal Energy Regulatory Commission (Commission), any court, or other body having appropriate authority, or by agreement of the Participants (subject to approval by the relevant authority);

v.   Notes of Privileged Material (memoranda, handwritten notes, or any other form of information (including electronic form) which copies or discloses Privileged Material);[6] or

vi.   Copies of Privileged Material.

vii.   Privileged Material does not include:

a.   Any information or document that has been filed with and accepted into the public files of the Commission, or contained in the public files of any other federal or state agency, or any federal or state court, unless the information or document has been determined to be privileged by such agency or court;

b.   Information that is public knowledge, or which becomes public knowledge, other than through disclosure in violation of this Protective Order; or

viii.   Additional Subcategories of Privileged Material in Oil Pipeline Proceedings:

a.   Section 15(13) Privileged Material:[7] Any materials, permitted to be produced by this Protective Order,

---

[6] Notes of Privileged Material are subject to the same restrictions for Privileged Material except as specifically provided in this Protective Order.

[7] Section 15(13) of the Interstate Commerce Act, 49 U.S.C. § 15(13), prohibits disclosure of information pertaining to the business activities of oil pipeline shippers or consignees. Participants disclosing such information in accordance with the terms of this Protective Order will be deemed to not have contravened the prohibitions of this

Docket No. ER24-_____-000                                      - 4 -

        concerning the nature, kind, quantity, destination or routing of any products tendered or delivered to a Participant for interstate transportation by or on behalf of a specific shipper, when the identity of the shipper is contained in or may be discerned from the material to be provided. This subcategory shall not apply if the shipper to whom such information pertains consents that the information be categorized as Privileged Material under the other provisions of this Protective Order or produced outside the scope of this Protective Order.

       b.    Highly Confidential Privileged Material: A Participant may use this designation for those materials that are of such a commercially sensitive nature among the Participants or of such a private, personal nature that the producing Participant is able to justify a heightened level of confidential protection with respect to those materials.

C.    Critical Energy/Electric Infrastructure Information (CEII): As defined at 18 C.F.R. §§ 388.113(a), (c).

D.    Non-Disclosure Certificate: The certificate attached to this Protective Order, by which Participants granted access to Privileged Material and/or CEII must certify their understanding that such access to such material is provided pursuant to the terms and restrictions of this Protective Order, and that such Participants have read the Protective Order and agree to be bound by it. All executed Non-Disclosure Certificates must be served on all Participants on the official service list maintained by the Secretary of the Commission for this proceeding.

E.    Reviewing Representative:[8] A person who has signed a Non-Disclosure Certificate and who is:

---

statutory provision.

    [8] For oil pipeline proceedings involving the additional subcategories of Privileged Material, there shall also be Section 15(13) Reviewing Representatives and Highly Confidential Reviewing Representatives subject to the corresponding terms of this definition.

Docket No. ER24-_____-000                                                    - 5 -

      i.        Commission Trial Staff designated as such in this proceeding;

      ii.      An attorney who has made an appearance in this proceeding for a Participant;

      iii.     Attorneys, paralegals, and other employees associated for purposes of this case with an attorney who has made an appearance in this proceeding on behalf of a Participant;

      iv.     An expert or an employee of an expert retained by a Participant for the purpose of advising, preparing for, submitting evidence or testifying in this proceeding;

      v.      A person designated as a Reviewing Representative by order of the Presiding Judge, the Chief Judge, or the Commission; or

      vi.     Employees or other representatives of Participants appearing in this proceeding with significant responsibility for this docket.[9]

4.      Privileged Material and/or CEII shall be made available under the terms of this Protective Order only to Participants and only to their Reviewing Representatives as provided in Paragraphs 6-10 of this Protective Order. The contents of Privileged Material, CEII or any other form of information that copies or discloses such materials shall not be disclosed to anyone other than in accordance with this Protective Order and shall be used only in connection with this specific proceeding.

5.      All Privileged Material and/or CEII must be maintained in a secure place. Access to those materials must be limited to Reviewing Representatives specifically authorized pursuant to Paragraphs 7-9 of this Protective Order.

6.      Privileged Material and/or CEII must be handled by each Participant and by each Reviewing Representative in accordance with the Non-Disclosure Certificate executed pursuant to Paragraph 9 of this Protective Order. Privileged Material and/or CEII shall not be used except as necessary for the conduct of this proceeding, nor shall they (or the substance of their contents) be disclosed in any manner to any person except a Reviewing Representative who is engaged in this proceeding and who needs to know the information

---

[9] In oil pipeline proceedings, individuals that have direct or supervisory responsibilities over the purchase, sale, marketing, or exchange of crude oil or petroleum products (including liquefied petroleum gases), are ineligible to qualify as a Reviewing Representative.

Docket No. ER24-____-000                                              - 6 -

in order to carry out that person's responsibilities in this proceeding.  Reviewing Representatives may make copies of Privileged Material and/or CEII, but such copies automatically become Privileged Material and/or CEII.  Reviewing Representatives may make notes of Privileged Material, which shall be treated as Notes of Privileged Material if they reflect the contents of Privileged Material.

7.      If a Reviewing Representative's scope of employment includes any of the activities listed under this Paragraph 7, such Reviewing Representative may not use information contained in any Privileged Material and/or CEII obtained in this proceeding for a commercial purpose (e.g. to give a Participant or competitor of any Participant a commercial advantage):

      A.      Energy marketing;

      B.      Direct supervision of any employee or employees whose duties include energy marketing; or

      C.      The provision of consulting services to any person whose duties include energy marketing.

8.      If a Participant wishes to designate a person not described in Paragraph 3.E above as a Reviewing Representative, the Participant must seek agreement from the Participant providing the Privileged Material and/or CEII.  If an agreement is reached, the designee shall be a Reviewing Representative pursuant to Paragraph 3.D of this Protective Order with respect to those materials.  If no agreement is reached, the matter must be submitted to the Presiding Judge for resolution.

9.      A Reviewing Representative shall not be permitted to inspect, participate in discussions regarding, or otherwise be permitted access to Privileged Material and/or CEII pursuant to this Protective Order until three business days after that Reviewing Representative first has executed and served a Non-Disclosure Certificate.[10]  However, if an attorney qualified as a Reviewing Representative has executed a Non-Disclosure Certificate, any participating paralegal, secretarial and clerical personnel under the attorney's instruction, supervision or control need not do so.  Attorneys designated Reviewing Representatives are responsible for ensuring that persons under their supervision or control comply with this Protective Order, and must take all reasonable

---

[10] During this three-day period, a Participant may file an objection with the Presiding Judge or the Commission contesting that an individual qualifies as a Reviewing Representative, and the individual shall not receive access to the Privileged Material and/or CEII until resolution of the dispute.

Docket No. ER24-____-000                                    - 7 -

precautions to ensure that Privileged Material and/or CEII are not disclosed to
unauthorized persons.  All executed Non-Disclosure Certificates must be served on all
Participants on the official service list maintained by the Secretary of the Commission for
the proceeding.

10.     Any Reviewing Representative may disclose Privileged Material and/or CEII to
any other Reviewing Representative as long as both Reviewing Representatives have
executed a Non-Disclosure Certificate.  In the event any Reviewing Representative to
whom Privileged Material and/or CEII are disclosed ceases to participate in this
proceeding, or becomes employed or retained for a position that renders him or her
ineligible to be a Reviewing Representative under Paragraph 3.D of this Protective Order,
access to such materials by that person shall be terminated.  Even if no longer engaged in
this proceeding, every person who has executed a Non-Disclosure Certificate shall
continue to be bound by the provisions of this Protective Order and the Non-Disclosure
Certificate for as long as the Protective Order is in effect.[11]

11.     All Privileged Material and/or CEII in this proceeding filed with the Commission,
submitted to the Presiding Judge, or submitted to any Commission personnel, must
comply with the Commission's *Notice of Document Labelling Guidance for Documents
Submitted to or Filed with the Commission or Commission Staff*.[12]  Consistent with those
requirements:

    A.     Documents that contain Privileged Material must include a top center
           header on each page of the document with the following text: CUI//PRIV.[13]
           Any corresponding electronic files must also include this text in the file
           name.

    B.     Documents that contain CEII must include a top center header on each page
           of the document with the following text: CUI//CEII.  Any corresponding
           electronic files must also include this text in the file name.

_____

[11] *See infra* P 19.

[12] 82 Fed. Reg. 18,632 (Apr. 20, 2017) (issued by Commission Apr. 14, 2017).

[13] The parties in oil pipeline proceedings may desire additional protection in their
handling of the following types of material as defined in this Protective Order: Section
15(13) Privileged Material; and Highly Confidential Privileged Material.  Participants
may incorporate these descriptive subcategories into their document labels as needed
(e.g., CUI//PRIV-Section 15(13) or CUI//PRIV-HC).

Docket No. ER24-____-000                                                         - 8 -

      C.     Documents that contain both Privileged Material and CEII must include a top center header on each page of the document with the following text: CUI//CEII/PRIV.  Any corresponding electronic files must also include this text in the file name.

      D.     The specific content on each page of the document that constitutes Privileged Material and/or CEII must also be clearly identified.  For example, lines or individual words or numbers that include both Privileged Material and CEII shall be prefaced and end with "BEGIN CUI//CEII/PRIV" and "END CUI//CEII/PRIV".

12.    If any Participant desires to include, utilize, or refer to Privileged Material or information derived from Privileged Material in testimony or other exhibits during the hearing in this proceeding in a manner that might require disclosure of such materials to persons other than Reviewing Representatives, that Participant first must notify both counsel for the disclosing Participant and the Presiding Judge, and identify all such Privileged Material.  Thereafter, use of such Privileged Material will be governed by procedures determined by the Presiding Judge.

13.    Nothing in this Protective Order shall be construed as precluding any Participant from objecting to the production or use of Privileged Material and/or CEII on any appropriate ground.

14.    Nothing in this Protective Order shall preclude any Participant from requesting the Presiding Judge (or the Chief Judge in the Presiding Judge's absence or where no presiding judge is designated), the Commission, or any other body having appropriate authority, to find this Protective Order should not apply to all or any materials previously designated Privileged Material pursuant to this Protective Order.  The Presiding Judge (or the Chief Judge in the Presiding Judge's absence or where no presiding judge is designated), the Commission, or any other body having appropriate authority may alter or amend this Protective Order as circumstances warrant at any time during the course of this proceeding.

15.    Each Participant governed by this Protective Order has the right to seek changes in it as appropriate from the Presiding Judge (or the Chief Judge in the Presiding Judge's absence or where no presiding judge is designated), the Commission, or any other body having appropriate authority.

16.    Subject to Paragraph 18, the Presiding Judge (or the Chief Judge in the Presiding Judge's absence or where no presiding judge is designated), or the Commission shall resolve any disputes arising under this Protective Order pertaining to Privileged Material according to the following procedures.  Prior to presenting any such dispute to the

Docket No. ER24-____-000                                              - 9 -

Presiding Judge, the Chief Judge or the Commission, the Participants to the dispute shall employ good faith best efforts to resolve it.

A.    Any Participant that contests the designation of material as Privileged Material shall notify the Participant that provided the Privileged Material by specifying in writing the material for which the designation is contested.

B.    In any challenge to the designation of material as Privileged Material, the burden of proof shall be on the Participant seeking protection. If the Presiding Judge, the Chief Judge, or the Commission finds that the material at issue is not entitled to the designation, the procedures of Paragraph 18 shall apply.

C.    The procedures described above shall not apply to material designated by a Participant as CEII. Material so designated shall remain subject to the provisions of this Protective Order, unless a Participant requests and obtains a determination from the Commission's CEII Coordinator that such material need not retain that designation.

17.    The designator will have five (5) days in which to respond to any pleading requesting disclosure of Privileged Material. Should the Presiding Judge, the Chief Judge, or the Commission, as appropriate, determine that the information should be made public, the Presiding Judge, the Chief Judge, or the Commission will provide notice to the designator no less than five (5) days prior to the date on which the material will become public. This Protective Order shall automatically cease to apply to such material on the sixth (6th) calendar day after the notification is made unless the designator files a motion with the Presiding Judge, the Chief Judge, or the Commission, as appropriate, with supporting affidavits, demonstrating why the material should continue to be privileged. Should such a motion be filed, the material will remain confidential until such time as the interlocutory appeal or certified question has been addressed by the Motions Commissioner or Commission, as provided in the Commission's regulations, 18 C.F.R. §§ 385.714, .715. No Participant waives its rights to seek additional administrative or judicial remedies after a Presiding Judge or Chief Judge decision regarding Privileged Material or the Commission's denial of any appeal thereof or determination in response to any certified question. The provisions of 18 C.F.R. §§ 388.112 and 388.113 shall apply to any requests under the Freedom of Information Act (5 U.S.C. § 552) for Privileged Material and/or CEII in the files of the Commission.

18.    Privileged Material and/or CEII shall remain available to Participants until the later of 1) the date an order terminating this proceeding no longer is subject to judicial review, or 2) the date any other Commission proceeding relating to the Privileged

Docket No. ER24-_____-000                                                    - 10 -


Material and/or CEII is concluded and no longer subject to judicial review.  After this time, the Participant that produced the Privileged Material and/or CEII may request (in writing) that all other Participants return or destroy the Privileged Material and/or CEII. This request must be satisfied with within fifteen (15) days of the date the request is made.  However, copies of filings, official transcripts and exhibits in this proceeding containing Privileged Material, or Notes of Privileged Material, may be retained if they are maintained in accordance with Paragraph 5 of this Protective Order.  If requested, each Participant also must submit to the Participant making the request an affidavit stating that to the best of its knowledge it has satisfied the request to return or destroy the Privileged Material and/or CEII.  To the extent Privileged Material and/or CEII are not returned or destroyed, they shall remain subject to this Protective Order.

19.    Regardless of any order terminating this proceeding, this Protective Order shall remain in effect until specifically modified or terminated by the Presiding Judge, the Chief Judge, or the Commission.  All CEII designations shall be subject to the "[d]uration of the CEII designation" provisions of 18 C.F.R. § 388.113(e).

20.    Any violation of this Protective Order and of any Non-Disclosure Certificate executed hereunder shall constitute a violation of an order of the Commission.


Presiding Administrative Law Judge

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

Northwest Rural Public Power District     )
Complainant                               )
                                          )     Docket No. EL24-___-000
                    v.                    )
                                          )
Basin Electric Power Cooperative          )
                  and                     )
                                          )
Tri-State Generation and Transmission     )
Association, Inc.                         )
                                          )
            Respondents                   )

### NON-DISCLOSURE CERTIFICATE

I hereby certify my understanding that access to Privileged Material[1] and/or Critical Energy/Electric Infrastructure Information (CEII) is provided to me pursuant to the terms and restrictions of the Protective Order in this proceeding, that I have been given a copy of and have read the Protective Order, and that I agree to be bound by it. I understand that the contents of Privileged Material and/or CEII, any notes or other memoranda, or any other form of information that copies or discloses such materials, shall not be disclosed to anyone other than in accordance with the Protective Order.  I acknowledge that a violation of this certificate constitutes a violation of an order of the Federal Energy Regulatory Commission.

By: _____

Printed Name: _____

Title: _____

Representing: _____

Date: _____

---

[1] If applicable, for pipeline proceedings involving additional subcategories of Privileged Material, the signatory should indicate here whether this Non-Disclosure Certificate additionally governs access to:

☐ : Section 15(13) Privileged Material

☐ : Highly Confidential Privileged Material