**UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| McKenzie Electric Cooperative, Inc., | ) | Docket No. EL25-___-000 |
|     Complainant, | ) | |
| | ) | |
|       v. | ) | |
| | ) | |
| Basin Electric Power Cooperative, | ) | |
|     Respondent. | ) | |

**COMPLAINT OF MCKENZIE ELECTRIC COOPERATIVE, INC., REQUEST FOR ENFORCEMENT OF THE FEDERAL POWER ACT, AND REQUEST FOR EMERGENCY STAY, SHORTENED ANSWER PERIOD, AND FAST TRACK PROCESSING**

Pursuant to Sections 306 and 309 of the Federal Power Act ("FPA")[1] and Rule 206 of the Federal Energy Regulatory Commission's ("Commission" or "FERC") Rules of Practice and Procedure,[2] McKenzie Electric Cooperative, Inc. ("McKenzie") hereby files this complaint ("Complaint") against Basin Electric Power Cooperative ("Basin"), alleging that Basin has engaged in a nominal and sham transaction with the Rural Utilities Service ("RUS")—a $928,000 loan (the "RUS Loan")—for the purpose of evading the jurisdiction of the Commission in violation of the FPA.  This Complaint seeks a Commission finding that the transaction in question is void or ineffective for jurisdictional purposes, is inconsistent with FPA Section 204, and requests that FERC confirm its regulatory authority over Basin and the affected assets or services.

McKenzie further requests that the Commission issue an emergency stay to Basin's current authorization under FPA Section 204 to the extent necessary to prevent the RUS Loan

---

[1] 16 U.S.C. §§ 825e and 825h.
[2] 18 C.F.R. § 385.206.

**EXHIBIT 5**

from funding while the Commission considers this Complaint.  McKenzie respectfully asserts

that the facts bear out that an emergency stay of such limited scope will not deprive Basin of the

capital necessary to operate its business or reliably provide the services of a public utility, while

also ensuring that the Commission retains jurisdiction over Basin while addressing the issues

raised here.

McKenzie also requests that the Commission adopt a shortened answer period of fifteen

(15) days and address this Complaint under fast track processing to ensure that Basin does not

violate Section 204.  Time is of the essence, considering the progress that Basin had made in has

applied for and obtained RUS approval for a loan pursuant to the Rural Electrification Act of

1936 ("REAct") without alerting the Commission or Basin's members.  Fast track processing is

necessary to provide the Commission with the opportunity, before the RUS Loan funds, to fully

consider the issues addressed in this Complaint and whether the RUS Loan and Basin's efforts to

avoid regulatory oversight are contrary to the public interest.  Because the timeline for funding is

unknown, McKenzie respectfully requests that the Commission act on this Complain by no later

than August 1, 2025.  If the Commission is unable to grant fast track processing to this

Complaint, then McKenzie respectfully requests the Commission set the matter for hearing

procedures.

## I.    INTRODUCTION

Section 204 of the FPA, 16 U.S.C. § 824c, prohibits a public utility like Basin from

incurring liabilities unless the Commission authorizes the debt upon finding that it is "for some

lawful object, within the corporate purposes of the applicant and compatible with the public

interest, which is necessary or appropriate . . . for such purposes."  This statutory text grants the

Commission a gatekeeping role over a public utility's financing activities, requiring a forward-

looking determination of whether a particular liability aligns with both corporate legitimacy and the broader public interest. That is precisely why the Commission has the responsibility to review and evaluate Basin's RUS Loan at issue here.

Under Section 204, the Commission's role is not merely ministerial. The phrase "compatible with the public interest" is not defined by statute, which gives the Commission interpretive discretion to consider a range of factors in assessing whether a liability satisfies this standard. Courts have consistently granted agencies discretion in interpreting such broad language, particularly where the statute acknowledges their specialized expertise.[3] As such, the Commission may determine that maintaining regulatory jurisdiction is integral to the public interest standard under Section 204.

The FPA's structure reflects a comprehensive framework of federal oversight over public utilities, like Basin, engaged in interstate transmission and wholesale sales of power and energy. That framework reinforces the Commission's ability – even its duty – to act here. For example, Sections 205 and 206 grant FERC comprehensive authority to ensure just and reasonable rates and to remedy unjust practices. FERC would have no ability to do so if, owing to a nominal and pretextual transaction such as Basin's, it loses jurisdiction over the entities engaged in those activities. Section 204, therefore, must be read in harmony with these provisions to protect FERC's jurisdiction from public utilities' efforts to forum shop and avoid public scrutiny.[4] That is especially true here, where, as here, such scrutiny has already revealed unlawful rates. In this

---

[3] *See, e.g., Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984). The Supreme Court's *Chevron* ruling was modified by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), however it still remains the case that courts can and should defer to regarding an agency's interpretation of a statute. Only the level of deference has changed.

[4] *See, e.g., Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 759 (1973) ("*Gulf States*") ("Nothing in the Act suggests that the 'public interest' standard of s 204 contains any less broad directive than that contained in the other similarly worded and adjacent sections.").

context, the Commission has the power to deny financing arrangements that could compromise its statutory responsibilities and endanger the public good.

FERC's authority to review transactions that implicate jurisdictional issues is also confirmed by its actions under related provisions of the FPA. For example, under Section 203, which governs the disposition of jurisdictional facilities, the Commission routinely evaluates whether proposed transactions would impair its oversight authority.[5] There is no reason that Section 204 should be interpreted more narrowly. Indeed, judicial interpretations of Section 204 have confirmed FERC's responsibility to consider a wide range of factors, including financial integrity and anticompetitive effects, when authorizing liabilities to be incurred by a utility.[6] Moreover, the public interest standard in Section 204 is *not limited to* financial considerations but encompasses broader economic and regulatory concerns.[7] If the purpose of a proposed liability is to strip FERC of its jurisdiction over a public utility that has already been found to have imposed unlawful rates, the Commission may reasonably conclude that such an arrangement would improperly defeat FERC's statutory command to fulfill its regulatory duties.

In sum, it is not only within the Commission's authority under Section 204's public interest standard to bar Basin's pretextual transaction from removing it from FERC's oversight,[8] but doing so is prudent and necessary to protect the integrity of the FPA's regulatory scheme. The statute was designed to ensure that financing arrangements by public utilities do not

---

[5] *See, e.g.*, *Duke Energy Fla., LLC*, 181 FERC ¶ 61,217, at P 34 (2022) ("The Commission's analysis of whether a proposed transaction is consistent with the public interest generally involves consideration of three factors: (1) the effect on competition; (2) the effect on rates; and (3) the effect on regulation.").

[6] *See, e.g.*, *Gulf States*, 411 U.S. at 756 ("In making its determination under s 204(a), the Commission is given broad powers of inquiry and enforcement.").

[7] *Id*. at 759 ("Under the express language of s 204 the public interest is stressed as a governing factor. There is nothing that indicates that the meaning of that term is to be restricted to financial considerations, with every other aspect of the public interest ignored.").

[8] Indeed, should Basin's gambit succeed, Basin will be removed from *all* independent regulation, because Basin is not subject to regulation by any state agency.

undermine the public interest.[9]  Preserving FERC's jurisdiction over Basin is central to that mission.

## II.    COMMUNICATIONS

All communications, correspondence, and documents related to this proceeding should be directed to the following persons and such persons should be placed on the official service list maintained by the Commission's Secretary for this proceeding:

Jason Johns
Jessica Bayles
Jeremy D. Sacks
Per A. Ramfjord
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel: 503-294-9618
jason.johns@stoel.com
jessica.bayles@stoel.com
jeremy.sacks@stoel.com
per.ramfjord@stoel.com

Matthew Hanson
McKenzie Electric Cooperative, Inc.
3817 23rd Avenue NE
Watford City, ND  58854
Tel: 701-444-9288
mhanson@mckenzieelectric.com

## III.    BACKGROUND

### a.  McKenzie Electric Cooperative, Inc.

McKenzie is a member-owned rural electric cooperative that serves approximately 4,400 residential, commercial, and industrial member-owners in portions of seven counties in North Dakota and Montana.  McKenzie is a Class C member of Basin and purchases the entirety of its power requirements – mostly Basin power – via Upper Missouri G. & T. Electric Cooperative, Inc. d/b/a Upper Missouri Power Cooperative ("Upper Missouri"), which is a Class A member of Basin.  McKenzie is the largest (as measured by load) of the 11 member-owners of Upper Missouri.  The all-requirements documents establishing this Basin-Upper Missouri-

---

[9] *Gulf States*, 411 U.S. at 756 ("In making its determination under s 204(a), the Commission is given broad powers of inquiry and enforcement.").

129060030.10 0069518-00014

McKenzie power purchasing relationship currently have a term that expires in 2075. Under this arrangement, the primary component of McKenzie's costs for electric service is Basin's Rate Schedule A rates for all-requirements service, which is passed through to McKenzie in Upper Missouri's rates. McKenzie allocates the costs that it incurs under its all-requirements contract to its own member-owners, *i.e.*, residential, commercial, and industrial consumers, through retail rates.

### b. Basin Electric Power Cooperative

Basin is a not-for-profit, consumer-owned rural electric generation and transmission ("G&T") cooperative corporation organized under the laws of the State of North Dakota. Basin was founded on May 5, 1961, by representatives of member-owned cooperatives in North Dakota, South Dakota, Minnesota, Montana, and Iowa. Its purpose was to provide the additional electric power and energy needed by those cooperatives and their members, over and above their historic power allocations from the Western Area Power Administration. Basin owns substantial physical assets throughout its territory. Basin's electric transmission facilities include approximately 2,500 miles of electric transmission lines and equipment located in 93 switchyards. Basin operates approximately 5,200 megawatts of electric generating capacity and has approximately 8,100 megawatts of capacity in its generation portfolio. Basin provides supplemental wholesale power to 140 rural electric member systems in Colorado, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, South Dakota, and Wyoming.[10] Basin controls virtually all of the power generation available to *approximately three million member-consumers across nine states* in the Eastern Interconnection and the Western Interconnection. Consequently, Basin engages in the interstate businesses of transmitting and

---

[10] *Basin Electric Power Cooperative*, Submission of Revised Rate Schedule A, Docket No. ER25-11-000, at 2 (filed Oct. 2, 2024).

129060030.10 0069518-00014

selling electric energy on a geographic scale that is materially equivalent to some of the largest public utilities in the nation.

In June 2024, a presiding Administrative Law Judge ("ALJ") at FERC issued an initial decision determining that the rates that Basin charged its members for wholesale energy throughout the 2020 and 2021 rate years were unjust, unreasonable, and unlawful because, in part, Basin's rates included amounts used to recover the significant losses incurred by its nonutility subsidiary, Dakota Gasification Company ("DGC"), in violation of fundamental principles of cost-based ratemaking.[11]  The June 2024 Initial Decision concluded that consumers of Basin's power had been overcharged by hundreds of millions of dollars in each of the rate periods, ordering disallowances that return those funds to the ratepayers who had been overcharged.  Four additional rate years remain held in abeyance pending a Commission decision on the June 2024 Initial Decision in the 2020-21 rate case, meaning that consumers in Basin's service territory may ultimately be owed at least half a decade's worth of refunds for Basin's rates that violate the FPA, because Basin has done nothing to change its unlawful rate setting methodologies.[12]

Basin has been clear in its desire to avoid the impact of the Initial Decision and any opinion implementing its findings[13] and to continue forcing consumers within its service territory to keep its struggling, nonutility Dakota Gasification Company subsidiary – which is now primarily a fertilizer plant – afloat.  The purpose of the RUS Loan is to fulfill that desire—to

---

[11] *Basin Elec. Power Coop.*, 187 FERC ¶ 63,021 (2024) ("Initial Decision").
[12] Note, however, that Basin has asserted that should it depart FERC jurisdiction upon obtaining a RUS loan, FERC would no longer have authority to enforce the FPA against it for the period during which Basin plainly was subject to FERC jurisdiction—that is, from 2019 until the present.  In other words, Basin asserts that obtaining a RUS loan will allow it to avoid any refunds ultimately ordered by the Commission for that period.  Initial Brief of Basin Electric Power Cooperative on Financial Effects of Cost Disallowance, Docket No. ER20-2441-002 *et al.*, at 29 n.154 (filed Feb. 28, 2024).
[13] *See, e.g., id.*

restore the status quo ante—by allowing Basin to set rates without independent oversight.

### c. The RUS Loan

On January 16, 2025, the RUS approved Basin's application for a $928,000 loan to be funded pursuant to the Rural Electrification Act of 1936 ("REAct").[14] The loan is scheduled to mature on January 16, 2027, two years after its approval. According to publicly available information, the purpose of the loan is "[t]o assure that people in eligible rural areas have access to electric services comparable in reliability and quality to the rest of the Nation and to assist borrowers in implementation of demand-side management, energy efficiency and conservation programs and on-grid and off-grid renewable energy systems."[15] McKenzie believes that Basin will pay an interest rate under the loan equal to the U.S. Treasury rate, approximately 2.750%.[16] As a result, if the loan were funded today, Basin would pay an annual interest expense of approximately $25,520 to avoid regulatory oversight. To McKenzie's knowledge, the RUS has not funded the loan as of the date of this Complaint.

Until 10 years ago, Basin had for years enjoyed low-interest, government-guaranteed financing issued by the RUS. However, Basin perceived the RUS as insufficiently nimble to meet Basin's growing financing needs and as imposing unwanted limitations on Basin's desire to guarantee the debts of subsidiaries such as Dakota Gasification Company. Consequently, in 2014 and early 2015, Basin management repeatedly asserted that the refinancing of its RUS debt through publicly available sources would give it greater flexibility than it had under the RUS

---

[14] *See* USASpending.gov, Award Profile: Loan Summary, Loans to BASIN ELECTRIC POWER COOPERATIVE, *available at*
*https://www.usaspending.gov/award/ASST_NON_CLSS00000090678_12E2* (last visited June 9, 2025);
Rural Electrification Act of 1936, 7 U.S.C. 901 *et seq.* (REAct).
[15] USASpending.gov, Award Profile: Loan Summary, Loans to BASIN ELECTRIC POWER COOPERATIVE, *id*.
[16] 7 C.F.R. § 1714.5.

system.  In early 2015, the Basin board of directors agreed, and Basin refinanced *$1.2 billion* in RUS debt with private lenders, with an issuance cost of at least $136 million, of which $125.8 million was a prepayment premium paid to the RUS.  The remainder was paid as a fee to Basin's bankers, who led the refinancing.

Notwithstanding its prior very public position, Basin is now seeking RUS financing of a $928,000 loan—a trivial portion of its overall debt.  Basin has kept its members in the dark with respect to its new RUS Loan.  Basin has shared little to no information with its member-owner electric cooperatives about the existence of or reasons for seeking this new RUS loan.  Indeed, as late as February 2025—*after* Basin applied for and secured the RUS Loan—Basin did not include the REAct loan in its list of capital resources disclosed to members.[17]  Nor has Basin sought approval from its members to take such steps.  And now Basin seeks to return to the RUS for a paltry $928,000 loan so that it may avoid FERC jurisdiction and continue including nonutility costs in its rates.

White not publicly discussed, the true purpose of the RUS Loan is clearly to avoid FERC regulatory oversight of its rates going forward so it can continue to charge rates that the initial decision concluded were unlawful.  Indeed, Basin acknowledged this fact during the 2020-21 rate case.  The ALJ asked the parties to address the financial impacts of a disallowance and how Basin might respond and fund such a refund.  In response, Basin explained that "[i]f FERC orders a disallowance that would impact Basin Electric's future rates and solvency, Basin Electric could borrow from RUS so that it no longer would be subject to FERC's jurisdiction.  Then, Basin Electric could seek to raise its rates to cover costs FERC disallowed that RUS

---

[17] Attachment 1, Year to Date Financials Presentation at District Manager's Meeting, Basin Electric Power Cooperative, at p. 17 (2025).  Tellingly, Basin *did* note the NewEra grant it received from RUS, which will not terminate FERC jurisdiction.

previously allowed."[18] Basin's plan was hiding in plain sight all along, and its statement leaves

no doubt that if the Commission does not act to preserve its jurisdiction, Basin will take actions

to reverse any impacts that it experiences as a regulated public utility.

### d.  The Context of Basin's Capital Requirements

The true purpose of the proposed $928,000 RUS Loan is also evident from the fact that it

is unnecessary for any purpose other than escaping FERC jurisdiction.  Today, Basin is a large

multi-state utility that has significant impacts on wholesale markets and interstate commerce.  In

its most recent Form 714, Basin reported coincident peak demand in 2024 of 3,823 MWh

(winter) in the Southwest Power Pool region, among the highest in that balancing authority area

and where it is a transmission-owning member, and 385.2 MWh (winter) in its service territory

in the Western Interconnection.[19]  Basin first sought authorization to issue short- and long-term

debt in September 2019, which request the Commission granted,[20] and Basin has since refreshed

its Section 204 authorization several times.[21]  Basin filed its most recent Section 204

---

[18] Attachment 2, Excerpt of Initial Brief of Basin Electric Power Cooperative on Financial Effects of Cost Disallowance, Docket No. ER20-2441-002 *et al.*, at 29 (filed Feb. 28, 2024) (footnote omitted).

[19] Southwest Power Pool, FERC Form 714, Annual Electric Balancing Authority Area and Planning Area Report for the Year Ending December 31, 2024, at 8 (filed May 14, 2025); Basin Electric Power Cooperative, FERC Form 714, Annual Electric Balancing Authority Area and Planning Area Report for the Year Ending December 31, 2024, at 8 (filed May 22, 2025).

[20] *Basin Electric Power Cooperative*, Application for Authorization to Issue Short- and Long-Term Debt and Guarantees and for Waivers, Docket No. ES19-71 (filed Sept. 30, 2019); *Basin Elec. Power Coop.*, 169 FERC ¶ 62,062 (2019) (authorizing specified issuances and liabilities effective from November 1, 2019 through October 31, 2021).

[21] *Basin Electric Power Cooperative*, Application for Authorization to Issue Short- and Long-Term Debt and Guarantees and for Waivers, Docket No. ES21-82 (filed Sept. 21, 2021); *Basin Elec. Power Coop.*, 177 FERC ¶ 62,061 (2021) (authorizing specified issuances effective from November 1, 2021 through October 31, 2023); *Basin Electric Power Cooperative*, Application for Amended and Restated Authorization to Issue Short- and Long-Term Debt and Guarantees and for Waivers, Docket No. ES22-23 (filed Nov. 16, 2021); *Basin Elec. Power Coop.*, 177 FERC ¶ 62,167 (2021) (superseding the prior order and authorizing specified issuances and liabilities effective from January 1, 2022 through October 31, 2023).

authorization on August 31, 2023, in Docket No. ES23-67,[22] where Basin requested authority to issue the following:

> (1) short-term indebtedness in an aggregate amount not to exceed $1.4 billion outstanding at any one time under a combination of revolving credit facilities, short-term notes, commercial paper, or similar obligations;
>
> (2) long-term indebtedness in an aggregate amount not to exceed $5.6 billion outstanding at any one time;
>
> (3) additional long-term and short-term debt, in an aggregate amount not to exceed $500 million outstanding at any one time, under its Member Investment Program; and,
>
> (4) guarantees and other credit support for the obligations of certain affiliates and subsidiaries ("Affiliates") in an aggregate amount not to exceed $1.2 billion outstanding at any one time.[23]

Currently, Basin utilizes approximately $4.4 billion[24] of the existing $5.6 billion dollar authorization for long-term debt.[25] But Basin's future plans include the need for much greater debt—about $9.2 billion more over the next nine years[26]—to be raised from private placements and the public market (Basin recently registered with the U.S. Securities & Exchange Commission). The $928,000 RUS Loan amounts to approximately 1/10,000th of Basin's projected borrowing, leading one to conclude that the RUS Loan is not about assuring that

---

[22] *Basin Electric Power Cooperative*, Application for Authorization to Issue Short- and Long-Term Debt and Guarantees and for Waivers, Docket No. ES23-67 (filed Aug. 31, 2023) (the "Application").
[23] Application at 1, 4-5.
[24] *Basin Electric Power Cooperative*, FERC Financial Report FERC Form No. 1: Annual Report of Major Electric Utilities, Licensees and Others and Supplemental Form 3-Q: Quarterly Financial Report (filed April 16, 2025).
[25] *Basin Electric Power Cooperative*, FERC Financial Report FERC Form No. 1: Annual Report of Major Electric Utilities, Licensees and Others and Supplemental Form 3-Q: Quarterly Financial Report, at 112-113 (filed April 16, 2025).
[26] *Id*. at Slide 20.

"people in eligible rural areas have access to electric services,"[27] but simply escaping FERC regulatory oversight.

## IV.     ARGUMENT

The FPA establishes a comprehensive regime of federal oversight of the transmission and wholesale sale of electric energy in interstate commerce.  At its core, the FPA ensures that public utilities remain subject to regulation by the Commission, thereby promoting just and reasonable rates, nondiscrimination, and reliable service.  This statutory framework would be rendered meaningless if public utilities such as Basin were permitted to engage in nominal, pretextual transactions designed to allow the utility to circumvent the Commission's jurisdiction. Preserving jurisdiction is essential to the Commission's mandate under the FPA to ensure just and reasonable rates, prevent undue discrimination, and maintain oversight over utility practices.[28]

FERC's authority under the FPA is broad and purposeful.  Section 201 of the Act provides that the Commission shall regulate the transmission of electric energy in interstate commerce and the wholesale sale of such energy, and that this jurisdiction applies to "public utilities."[29]  Allowing a public utility to engage in an unnecessary financial arrangement for no other reason than defeating pre-existing FERC jurisdiction, as Basin seeks to do here, would frustrate the FPA's objectives and invite regulatory arbitrage.

In matters of regulatory jurisdiction, substance governs over form.  In *Getty Oil Company v. Department of Energy*,[30] the court emphasized that "[a] regulatory agency is no more bound

---

[27] *See* USASpending.gov, Award Profile: Loan Summary, LOANS to BASIN ELECTRIC POWER COOPERATIVE | USAspending, *supra*, note 14.

[28] *See, e.g.*, *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 610 (1944).

[29] 16 U.S.C. § 824(b)(1).

[30] 749 F.2d 734 (Temp. Emer. Ct. App. 1984).

12

than is a court by the form in which regulated parties choose to cast a transaction, but may look beyond form to the economic substance, in order to further the regulatory purpose of Congress."[31]  As FERC has explained when making jurisdictional determinations, it "focus[es] on the substance rather than the form of corporate transactions and relationships."[32]  Where, as here, a transaction is designed to evade regulatory oversight, FERC is empowered to disregard the game playing and assert jurisdiction over the true arrangement—*before* it loses jurisdiction.

Sections 204 and 309 empower FERC to proactively protect its regulatory authority. Denying a loan that threatens that jurisdiction is a reasonable, necessary, and lawful exercise of its duty to protect the public interest.

### a.  Basin Is Using the RUS Loan to Buy Its Way Out of Regulatory Oversight

There is no question that Basin's proposed RUS Loan is unnecessary for Basin to satisfy its legitimate financial needs.  In 2015, Basin had $1.2 billion in debt with the RUS.  Then it bought out of its RUS loan.  Today, Basin carries about $4.4 billion in long-term debt and projects about $9.2 billion in additional debt over the next nine years.[33]  To assume that Basin's new $928,000 loan is about anything other than a cheap ticket to escape regulation under the FPA is fantasy—particularly when Basin gave up the game in its FERC brief cited previously as well as testimony offered during the 2020-21 rate case.[34]

---

[31] *Id.* at 737.

[32] *Re Cent. Vermont Pub. Serv. Corp.*, 84 P.U.R.4th 213 (FERC 1987); *see also Luzenac Am., Inc.*, 121 FERC ¶ 61,084, at P 32 (2007) ("[I]n determining whether a contract contemplates wholesale transactions subject to our jurisdiction, the Commission is required to focus on the substance of these transactions, not simply the parties' contractual recitations."); *Re People's Elec. Coop.*, 60 FERC ¶ 63,014 (1992) ("It is important to analyze the 'economic substance' of the [ ] transactions, and not just the form of the transactions. . . . In this regard, while the [ ] transactions may have the 'form' of valid jurisdictional resales or, some time in the future possibly transmission as well, the 'economic substance' of the transactions proves that People's is the provider of retail, not wholesale service.").

[33] Attachment 1 at p. 20.

[34] Initial Brief of Basin Electric Power Cooperative on Financial Effects of Cost Disallowance, Docket No. ER20-2441-002 *et al.*, at 29 (filed Feb. 28, 2024).  Transcript 10229:17-23, Docket No. ER20-2441-002 *et al.* (Q. [Presiding Judge] "Ms. Shelton or Ms. Halpern, so the next topic is leaving Commission

### b.  Section 204's Public Interest Standard Bars the RUS Loan.

In its most recent Section 204 request, Basin represented to the Commission that "[i]f [Basin] were not permitted to engage in the financing activities that are the subject of this application, it would significantly impair Basin Electric's ability to continue to provide and perform [reliable transmission service and power generation and sales to its Members]."[35] That statement plainly does not apply to the RUS Loan at issue here, which constitutes hardly a drop Basin's financial bucket.

FERC has the authority and duty to evaluate whether a proposed loan is *necessary or appropriate* for the utility to perform its service obligations[36]—conditions that Basin represented would exist with all debt incurred pursuant to its Section 204 authority.[37]  This mandate does not compel the Commission to approve every financing request submitted by a public utility, including Basin's *de minimis* RUS Loan, which is less than 1/10,000th of Basin's projected borrowing over the next nine years.[38]  It is even less substantial when Basin's current borrowing is also considered.  The Commission has discretion to determine that Basin's RUS Loan at issue is inconsistent with Section 204 because doing so does not pose any credible threat to Basin's ability to provide reliable service.

Necessity under the FPA must be grounded in operational or financial imperatives—not merely in a utility's *preference* for additional (and *de minimis*) liquidity or its distaste for

---

jurisdiction to borrow from RUS.  Is that what you meant?  A. [Ms. Shelton] Yes.  Well, Your Honor, what was meant there was that Basin Electric could borrow funds from RUS, in which case it would once again become exempt under the Federal Power Act, Section 201F, as it was before.").

[35] Application at 8.

[36] 16 U.S.C. § 824c.

[37] Application at 8.

[38] Attachment 1, Year to Date Financials Presentation at District Manager's Meeting, Basin Electric Power Cooperative (2025).

regulatory oversight.  In *El Paso Electric Co.*, for example, the Commission stated that its evaluation of whether "a proposed transaction is in the public interest pursuant to Section 204 of the Federal Power Act is not limited to the narrow consideration that the transaction might impair the utility's financial integrity or its ability to perform its public utility service and responsibilities. . . .  The Commission in the *Gulf States* case was directed to inquire into and to evaluate the purpose of the security issuance and the use to which it proceeds would be put."[39] Basin has access to billions of dollars in funding through private placements and the public market and retains access to ample revenue streams to maintain infrastructure, procure power, and meet utility demand.[40]  Basin's RUS Loan is not "necessary" for the provision of service within the meaning of Section 204 or Basin's Section 204 authorization.  The FPA empowers the Commission to rule as such to protect the public interest.  By upholding rigorous standards for financial *necessity*, the Commission will strengthen confidence in the regulatory framework and safeguard consumer interests.  To do otherwise would allow any regulated G&T electric cooperative, which participates substantially in interstate commerce, to use *de minimis* RUS lending as a "get-out-of-jail-free" card:  It could avoid regulation and leave members without an objective regulator to ensure that rates do not include unlawful components.[41]  And that is exactly what Basin seeks.[42]  The Commission should act now, while it still has jurisdiction, to stop Basin's gambit.

---

[39] 2 FERC ¶ 61,212, 61,489 (1978) (citing *Pac. Power & Light Co.*, 27 F.P.C. 623 (1962), and *Gulf States Utils. Co.*, 411 U.S. 747).

[40] *See, e.g.*, Attachment 3, *Basin Electric Hosts Lenders Meeting in Minneapolis*, Basin Today (May 7, 2025).

[41] Initial Decision, 187 FERC ¶ 63,021 at PP 1359, 1410; *see generally* Initial Decision Section IV.C.6.

[42] *See, e.g.*, Attachment 2 (statements from Basin related to reversing the impacts of regulation).

### c. Unique Problems Require Unique Solutions.

To ensure that its public interest mandates are met, the FPA entrusts the Commission with broad discretion to craft remedies appropriate to the circumstances before it. This flexibility is especially vital when the Commission confronts novel or fact-specific problems to which existing rules or precedent have not yet been applied. But every situation was new once, even ones that have given rise to longstanding precedent. The issue before the Commission is new because no "Super G&T" electric cooperative has, to McKenzie's knowledge, ever tried to defeat FERC jurisdiction by borrowing a *de minimis* sum from the RUS and played games with jurisdictionality. That should not dissuade the Commission from addressing the issue head on.

Section 309 of the FPA expressly authorizes FERC "to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter."[43] Courts have consistently recognized that this provision grants the Commission broad remedial authority. In *Niagara Mohawk Power Corp. v. Federal Power Commission*,[44] the court held that FERC's discretion is "at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of Congressional objectives."[45] More recently, in *Verso Corp. v. FERC*, the D.C. Circuit reaffirmed that Section 309 empowers the Commission to "advance remedies not expressly provided by the FPA, as long as they are consistent with the [FPA]."[46]

---

[43] 16 U.S.C. § 825h.
[44] 379 F.2d 153 (D.C. Cir. 1967),
[45] *Id*. at 159.
[46] 898 F.3d 1, 10 (D.C. Cir. 2018).

The reality of modern energy markets—including the very real situation where large, multi-state electric cooperatives like Basin play games with jurisdiction—requires fact-specific, adaptive regulatory action.  Congress anticipated this need and provided the Commission with the necessary tools.  FERC's duty to ensure just and reasonable rates, prevent undue discrimination, and protect consumers is best fulfilled when the Commission responds to new problems with solutions designed to address their particular causes and consequences.  The Commission's concern should be with the consumers who will pay the price if Basin is successful in defeating FERC jurisdiction, not with unspecified slippery slopes.

### d.  Basin's Actions Are Inconsistent with the Purpose of the FPA.

Permitting Basin to circumvent regulation through a pretextual (and *de minimis*) RUS loan would encourage a race to the bottom, erode regulatory integrity, and leave ratepayers without an independent regulator to look out for their interests.  Such arrangements violate the spirit and purpose of the FPA, which is to ensure just and reasonable rates, prevent undue discrimination, and ultimately to protect consumers.  In the context of the Natural Gas Policy Act of 1978 and the Natural Gas Act, FERC has explained that while "it is not unusual, much less unlawful, for persons to structure transactions either to qualify for regulation by one entity or to avoid regulation by another,[] at some point such structuring may nevertheless be contrary to the public interest and inconsistent with the underlying purpose of statutes effecting a federal scheme of regulation."[47]  We are at that point right now.

Basin's actions harm the public interest and are inconsistent with the underlying purpose of the FPA.  Its transaction with the RUS has no legitimate financial or operational rationale beyond avoiding Commission oversight. Basin's comments in the 2020-21 rate hearing confirm

---

[47] *Egan Hub Partners, L.P.*, 72 FERC ¶ 61,225, 62,042 (1995) (citing *Riverside Pipeline Co.*, 48 FERC ¶ 61,309, 62,015-16 (1989)); *see also Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 (2024).

129060030.10 0069518-00014

as much and, as noted previously, they indicate that if Basin defeats FERC jurisdiction it will assert FERC has no jurisdiction to assess any refunds during Basin's period under FERC jurisdiction.[48]  And as a fallback, Basin has asserted that, if it were to become exempt from FERC jurisdiction again, it may seek to recover from its members any disallowances that FERC ordered during Basin's time as a regulated public utility.[49]  In other words, Basin's gambit is to retroactively insulate itself from any FERC decisions that would curb Basin's ability to foist unlawful costs on its members, even related to periods when Basin was unarguably jurisdictional.  The Commission must act decisively to prevent that outcome by preserving its jurisdiction and the integrity of its regulatory regime.

### e. Regulating Basin Is in the Public Interest.

It is in the public interest for FERC to maintain oversight of Basin.  In the 1967 *Dairyland* decision, for instance, the Commission explained that "jurisdiction over major generating and transmission cooperatives in interstate commerce, as opposed to those that merely transmit and distribute electric energy (including those generating small amounts of power), *would be in the public interest*. . . .  Since the generating and transmission cooperatives have become an important segment of the interstate electric industry, at least in certain parts of the country, they should not be exempt from regulation."[50]  That language neatly describes Basin.  Later, however, the Energy Policy Act of 2005 ("EPAct 2005") made explicit that electric cooperatives borrowing from RUS under the REAct were exempt from public utility regulation

---

[48] *See supra* note 36.
[49] Attachment 2, Excerpt of Initial Brief of Basin Electric Power Cooperative on Financial Effects of Cost Disallowance, Docket No. ER20-2441-002 *et al.*, at 29 (filed Feb. 28, 2024) ("If FERC orders a disallowance that would impact Basin Electric's future rates and solvency, Basin could borrow from RUS so that it no longer would be subject to FERC's jurisdiction.  Then, Basin Electric could seek to raise its rates to cover costs FERC disallowed that RUS previously allowed.").
[50] *Re Dairyland Power Co-op.*, Opinion No. 511, 37 F.P.C. 12, 28 (1967) (emphasis added).

under the FPA.[51]  Yet even after 2005, the Commission still recognized that large G&Ts selling

power in interstate commerce benefit from FERC regulation.  In 2010's *SDG&E*, for example,

the Commission noted approvingly *Dairyland*'s holding that "*major* generating and transmission

cooperatives participating in interstate commerce would be subject to the Commission's

jurisdiction."[52]  In other words, although the Commission recognized its post-2005 statutory

limitations in regulating RUS-financed cooperatives, it also acknowledged the value in doing so

where, like here, interstate markets were affected.  This realization should guide the Commission

to *maintain* its jurisdictional oversight of large G&Ts like Basin where the Section 201(f)

exemption is not yet in place.  That is, the Commission should not so easily release a major G&T

electric cooperative from regulation by gaming FPA Section 201(f) where jurisdiction currently

exists.  Rather, the Commission should act to protect consumers and keep its jurisdiction intact.[53]

As described above, Basin owns approximately 2,500 miles of electric transmission lines,

has equipment located in 93 switchyards, operates approximately 5,200 megawatts of electric

generating capacity, and has approximately 8,100 megawatts of capacity in its generation

portfolio across 500,000 square miles over nine states.  Basin controls virtually all of the power

generation available to approximately three million member-consumers in those states, and it is

also a transmission-owner member of the Southwest Power Pool.[54]  Considering the

---

[51] *See, e.g.*, *San Diego Gas & Elec. Co. Rehearing*, 131 FERC ¶ 61,062, at P 14 (2010) ("*SDG&E*") ("Until the passage of EPAct 2005, the Commission simply did not regulate RUS-financed cooperatives even where those cooperatives generated and transmitted electric energy for sale in interstate commerce."); *E. Tex. Elec. Coop., Inc.*, 120 FERC ¶ 61,118, at P 2 n.3 (2007) (citing EPAct of 2005 for "codifying exemption from FPA jurisdiction for electric cooperatives with RUS financing and electric cooperatives selling less than 4 million MWh per year").

[52] 125 FERC ¶ 61,297, at P 23 (2008), *order on reh'g*, 131 FERC ¶ 61,062 (2010) ("SDG&E Rehearing").

[53] *Kentucky Utils. Co.*, 50 F.P.C. 2103, 2106 (1973) ("Consideration of the public interest must necessarily take into account a myriad of factors including anti-competitive allegations.").

[54] Southwest Power Pool, Members & Market Participants, available at https://www.spp.org/about-us/members-market-participants/ (last accessed June 10, 2025) (indicating Basin is a Transmission Owner under the Open Access Transmission Tariff and Transmission Owning Member per bylaws).

Commission's longstanding view that large G&T electric cooperatives occupy a unique position among cooperatives and that subjecting them to regulation is in the public interest, the Commission should not allow Basin, the geographically-largest G&T electric cooperative in the nation, to evade regulatory oversight by obtaining a nominal loan from the RUS.  Ensuring that millions of consumers are not subjected to unlawful rates requires that the Commission maintain its oversight of Basin.

### f.   The Commission Can Grant the Relief Requested Without Creating a Slippery Slope.

The Commission need not worry that action here in this unusual case will create a slippery slope, either as a matter of law and administrative practice.  Section 204, 16 U.S.C. § 824c, authorizes the Commission to approve or deny a public utility's request to enter into a loan based on a case-by-case determination of whether the liability is "compatible with the public interest." The statute does not impose a rigid formula but rather entrusts the Commission with the discretion to evaluate the facts and context of each application and, by extension, each liability.[55] The use of this discretion in a unique or extraordinary circumstance does not obligate the Commission to take the same action in future, dissimilar cases.

First, federal law expressly allows agencies to distinguish among cases based on their specific facts.  The Supreme Court has emphasized that agencies are not required to apply a rule uniformly in all cases where the facts diverge materially.[56] So long as the agency explains its

---

[55] *El Paso Elec. Co.*, 2 FERC ¶ 61,212, 61,489 ("The Commission in determining that a proposed transaction is in the public interest pursuant to Section 204 of the Federal Power Act is not limited to the narrow consideration that the transaction might impair the utility's financial integrity or its ability to perform its public utility service and responsibilities. . . . The Commission in the *Gulf States* case was directed to inquire into and to evaluate the purpose of the security issuance and the use to which it proceeds would be put.") (citing *Pac. Power & Light Co.*, 27 F.P.C. 623, and *Gulf States*, 411 U.S. 747).
[56] *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-515 (2009) (holding that not every agency's decision to change course "must be justified by reasons more substantial than those required to adopt a policy in the first instance").

reasoning and addresses material differences, its decision to act in one case but not another does not establish a binding precedent. FERC has long relied on this principle, exercising its authority flexibly under Section 204 to reflect the specifics of each financial arrangement.[57]

Second, the public interest standard itself is inherently adaptable. Congress deliberately did not define the term "public interest" narrowly in Section 204. This reflects a recognition that the Commission must have room to account for market changes, structural innovations, and jurisdictional risks that may not arise in ordinary financing transactions. FERC's obligation is not to apply a mechanical checklist, but to ensure that public utilities' financial arrangements do not undermine just and reasonable rates, reliable service, or effective regulation. In rare cases where a financing proposal would erode regulatory jurisdiction or create novel threats to ratepayers, FERC has not only the authority but the duty to act.

Finally, the Commission's denial of a loan pursuant to Section 204 in one case does not mandate denial in others with different facts. Slippery slope concerns presuppose that taking action in one extreme case will commit FERC to intervening in far less problematic cases in the future. That fear misunderstands the nature of administrative discretion. As long as the Commission articulates a rational basis for distinguishing the case at hand—for example, that the utility's loan raises unique jurisdictional concerns not present in routine applications—it remains free to approve future liabilities that do not raise the same red flags.

In sum, FERC's action in a unique Section 204 case neither binds its future discretion nor invites a slippery slope. Rather, it reflects the Commission's obligation to tailor its oversight to the facts before it, ensuring that exceptional risks to jurisdiction or the public interest are addressed with the seriousness they deserve, and without compromising its ability to permit

---

[57] *See, e.g.*, *Gulf States Utilities Co.*, 411 U.S. at 756.

129060030.10 0069518-00014

ordinary transactions in the future.  Basin's sham transaction to avoid FERC jurisdiction by taking out a miniscule RUS loan is precisely the fact pattern that is both ripe for FERC to address and that is unlikely to arise again.

## V.    REQUEST FOR EMERGENCY STAY

McKenzie respectfully requests that the Commission issue an emergency stay to Basin's FPA Section 204 authorization to the limited extent necessary to prevent Basin from funding the RUS Loan while this Complaint remains pending.  In acting on stay requests, the Commission applies the standard set forth in the Administrative Procedure Act, 5 U.S.C. § 705, *i.e.*, the stay will be granted if the Commission finds that "justice so requires." Under this standard, the Commission considers a number of factors related to the public interest, such as whether the movant will suffer irreparable injury in the absence of the stay.[58]

McKenzie respectfully asserts that justice requires that the Commission fully consider and rule on whether it is in the public interest for Basin to withdraw from regulation under the FPA by using a nominal loan from the RUS.  McKenzie and millions of customers across nine states will suffer irreparable harm should Basin be freed of objective oversight, resume charging unlawful rates, and even recover from consumers the financial impacts that Basin experienced as the result of regulation.  Furthermore, the requested stay is of limited scope and would only prevent Basin from incurring a $928,000 loan—an amount that certainly is not necessary to Basin's providing utility services to consumers considering its financial resources and its access to capital.  Accordingly, the emergency stay is narrowly tailored to avoid irreparable harm that would result from Basin's withdrawing from the Commission's jurisdiction while also minimizing (or completely avoiding) any impacts to Basin's services to the public.

---

[58] *Pennsylvania Power & Light Co.*, 84 FERC ¶ 61,060, 61,266 (1998).

129060030.10 0069518-00014

## VI.    REQUEST FOR SHORTENED ANSWER PERIOD AND FAST TRACK PROCESSING

Pursuant to Rule 206(h) of the Commission's Rules of Practice and Procedure,[59]

McKenzie respectfully requests fast track processing of its Complaint against Basin, and requests

that the Commission issue a decision no later than July 15, 2025.  Expeditious resolution of the

Complaint is necessary because the RUS Loan has been approved since January 16, 2025, and

Basin may seek to fund the loan at any time.  Therefore, fast track processing is warranted so that

Basin cannot circumvent the Commission's jurisdiction to avoid regulatory oversight and cause

additional on-going financial harm to Basin's members.  Relatedly, McKenzie respectfully

requests that the Commission establish a shortened answer period of fifteen (15) days in order to

provide for the expeditious resolution of this Complaint and action by July 15, 2025.

## VII.    RULE 206 REQUIREMENTS

To the extent not already provided above, McKenzie provides the following additional

information as required by Rule 206 of the Commission's Rules of Practice and Procedures.

### a.    Clearly identify the action or inaction which is alleged to violate applicable statutory standards or regulatory requirements.

The actions which violate the applicable regulatory requirements are described above in

Sections III and IV.

### b.    Explain how the action or inaction violates applicable statutory standards or regulatory requirements.

An explanation as to how the aforementioned actions violate the applicable regulatory

requirements is detailed above in Section IV.

---

[59] 18 C.F.R. § 385.206(h).

**c. Set forth the business, commercial, economic or other issues presented by the action or inaction as such relate to or affect the complainant.**

The business, commercial, and economic impacts on McKenzie from Basin's actions are described above in Section IV.

**d. Make a good faith effort to quantify the financial impact or burden (if any) created for the complainant as a result of the action or inaction.**

The financial impact that Basin's actions will have on McKenzie are described above in Section IV. The specific financial impact to McKenzie is difficult to quantify, however the June 2024 initial decision quantifies the financial impact of Basin's unlawful rate setting practices for the years 2020 and 2021, which practices are likely to continue in the absence of the Commission's oversight.

**e. Indicate the practical, operational, or other nonfinancial impacts imposed as a result of the action or inaction, including, where applicable, the environmental, safety or reliability impacts of the action or inaction.**

The practical, operational, or other nonfinancial impacts imposed as a result of the action are described above in Section IV.

**f. State whether the issues presented are pending in an existing Commission proceeding or a proceeding in any other forum in which the complainant is a party, and if so, provide an explanation why timely resolution cannot be achieved in that forum.**

The issues presented are not pending in an existing Commission proceeding or in any other forum.

**g. State the specific relief or remedy requested, including any request for stay or extension of time, and the basis for that relief.**

McKenzie respectfully requests a Commission finding that the RUS Loan is inconsistent with the public interest under FPA Section 204 and is therefore void or ineffective for jurisdictional purposes. McKenzie also respectfully requests that FERC reassert regulatory authority over Basin and the affected assets or services.

24

**h. Include all documents that support the facts in the complaint in possession of, or otherwise attainable by, the complainant, including, but not limited to, contracts and affidavits.**

McKenzie has provided certain supporting materials as attachments to this Complaint and a verification executed by McKenzie's Chief Executive Officer, Mr. Matt Hanson.

**i. State whether the Enforcement Hotline, Dispute Resolution Service, tariff-based dispute resolution mechanisms, or other informal dispute resolution procedures were used, or why these procedures were not used.**

No informal dispute resolution procedures have been used. McKenzie does not believe that the issues raised here could be effectively resolved using alternative dispute resolution. Furthermore, considering that Basin's actions at the RUS may result in its being exempt from regulation, McKenzie considered it imperative to bring this matter to the Commission's attention before Basin may be exempt from regulation pursuant to FPA Section 201(f).

**j. Whether the complainant believes that alternative dispute resolution (ADR) under the Commission's supervision could successfully resolve the complaint.**

McKenzie does not believe that the issues raised here could be effectively resolved using alternative dispute resolution.

**k. What types of ADR procedures could be used.**

McKenzie does not believe that the issues raised here could be effectively resolved using alternative dispute resolution.

**l. Any process that has been agreed on for resolving the complaint.**

No processes have been agreed on for resolving the Complaint.

**m. Include a form of notice of the complaint suitable for publication in the FEDERAL REGISTER in accordance with the specifications in § 385.203(d) of this part. The form of notice shall be on electronic media as specified by the Secretary.**

*See* Attachment A.

25

## VIII.    CONCLUSION

For the reasons discussed above, McKenzie respectfully requests that the Commission find that Basin's actions to incur nominal debt with the RUS are inconsistent with, and barred by, FPA Section 204 as inconsistent with the public interest.  McKenzie also respectfully requests that the Commission declare that it retains jurisdiction over Basin and its interstate operations that are subject to the FPA.


Respectfully submitted,


*/s/ Jason Johns*
Jason A. Johns
Jeremy D. Sacks
Jessica L. Bayles
Per A. Ramfjord
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel: 503-294-9618
jason.johns@stoel.com
jeremy.sacks@stoel.com
jessica.bayles@stoel.com
per.ramfjord@stoel.com

*Counsel for McKenzie Electric Cooperative, Inc.*


Dated: June 10, 2025

129060030.10 0069518-00014

**Attachment A**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| McKenzie Electric Cooperative, Inc., | ) | Docket No. EL25-___-000 |
| *Complainant*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Basin Electric Power Cooperative, | ) | |
| *Respondent.* | ) | |

NOTICE OF COMPLAINT

( )

Take notice that on June 10, 2025, McKenzie Electric Cooperative, Inc. filed a formal complaint against Basin Electric Power Cooperative pursuant to Sections 306 and 309 of the Federal Power Act (FPA), 16 U.S.C. §§ 825e and 825h, and Rule 206 of the Federal Energy Regulatory Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.206, alleging that Basin has taken actions that violate Section 204 of the FPA, 16 U.S.C. § 824c, and requesting that the Commission enforce the Federal Power Act against Basin.

McKenzie Electric Cooperative, Inc. certifies that copies of the complaint were served on the contacts for Basin Electric Power Cooperative as listed on the Commission's list of Corporate Officials.

Any person desiring to intervene or to protest this filing must file in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure (18 C.F.R. §§ 385.211 and 385.214). Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make protestants parties to the proceeding. Any person wishing to become a party must file a notice of intervention or motion to intervene, as appropriate. The Respondent's answer and all interventions, or protests must be filed on or before the comment date. The Respondent's answer, motions to intervene, and protests must be served on the Complainants.

The Commission encourages electronic submission of protests and interventions in lieu of paper using the "eFiling" link at http://www.ferc.gov. Persons unable to file electronically should submit an original and 5 copies of the protest or intervention to the Federal Energy Regulatory Commission, 888 First Street, NE, Washington, DC 20426.

This filing is accessible online at http://www.ferc.gov, using the "eLibrary" link and is available for review in the Commission's Public Reference Room in Washington, DC. There is

an "eSubscription" link on the web site that enables subscribers to receive email notification when a document is added to a subscribed docket(s).  For assistance with any FERC Online service, please email FERCOnlineSupport@ferc.gov, or call (866) 208-3676 (toll free).  For TTY, call (202) 502-8659.

Comment Date: 5:00 pm Eastern Time on (                    ).

Debbie-Anne A. Reese,
Secretary.

**ATTACHMENT 1**

---

**Basin Year to Date Financials**



# Year to Date Financials

Chris Johnson
SVP & CFO

# Consolidated Net Income (Loss)
## For the Three Months Ended March 31, 2025

**Basin Electric Consolidated**

**NET INCOME AFTER TAX**

**UNAUDITED**

| | March 2025 | | | | | |
|---|---|---|---|---|---|---|
| | Monthly | | | YTD | | |
| (in millions) | Actuals | Budget | +/(-) Budget | Actuals | Budget | +/(-) Budget |
| Basin Electric | $ 2.3 | $ 11.7 | $ (9.4) | $ 42.2 | $ 35.4 | $ 6.8 |
| Dakota Gasification Company | (4.3) | (5.0) | 0.7 | (2.4) | (7.6) | 5.2 |
| Dakota Coal Company | 0.5 | (1.5) | 2.0 | 5.5 | 2.4 | 3.1 |
| Interco. Eliminations & Other* | 4.3 | 5.0 | (0.7) | 2.4 | 7.6 | (5.2) |
| **Consolidated Net Income/(Loss) After Tax** | **$ 2.8** | **$ 10.2** | **$ (7.4)** | **$ 47.7** | **$ 37.8** | **$ 9.9** |

*Includes elimination of income/loss on investment in DGC*

BASIN ELECTRIC POWER COOPERATIVE
A Touchstone Energy® Cooperative

# March Year to Date Financial Results



YtD Actuals vs. YtD Budget (in millions)



# Net Margin Comparison

## Year to Date March 2025 Actual to Budget





# Sales to Members
## (In Millions)





**March 2025
Year-to-Date (In Millions)**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actual** | $ 199.7 | $ 184.9 | $ 171.1 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| **Budget** | $ 205.6 | $ 195.3 | $ 190.6 | $ 163.2 | $ 163.2 | $ 183.0 | $ 204.4 | $ 203.3 | $ 185.5 | $ 183.9 | $ 192.4 | $ 209.8 |
| **Last Year** | $ 186.7 | $ 158.6 | $ 161.2 | $ 148.1 | $ 151.4 | $ 163.5 | $ 183.2 | $ 185.4 | $ 169.8 | $ 153.4 | $ 161.4 | $ 173.2 |

BASIN ELECTRIC
POWER COOPERATIVE
A Touchstone Energy® Cooperative

# Sales to Members MWh
## (In Thousands of MWhs)



March 2025
Year-to-Date (In Millions)

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actual** | 3,281.8 | 2,956.6 | 2,867.1 | | | | | | | | | |
| **Budget** | 3,365.8 | 3,045.3 | 3,073.9 | 2,575.0 | 2,564.3 | 2,732.4 | 3,139.9 | 3,116.8 | 2,752.6 | 2,942.9 | 3,112.0 | 3,435.2 |
| **Last Year** | 3,175.9 | 2,668.6 | 2,835.9 | 2,552.5 | 2,574.4 | 2,723.8 | 3,016.1 | 2,923.9 | 2,726.6 | 2,699.8 | 2,793.7 | 3,080.4 |

**BASIN ELECTRIC POWER COOPERATIVE**
A Touchstone Energy® Cooperative

# Surplus Sales Revenue
## (In Millions)



| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actual** | $ 22.2 | $ 21.6 | $ 16.4 | | | | | | | | | |
| **Budget\*\*** | $ 20.5 | $ 14.4 | $ 12.1 | $ 7.5 | $ 8.0 | $ 15.5 | $ 23.6 | $ 25.4 | $ 22.3 | $ 12.1 | $ 12.8 | $ 67.5 |
| **Last Year\*** | $ 47.6 | $ 17.4 | $ 29.8 | $ 9.8 | $ 9.2 | $ 12.1 | $ 24.7 | $ 22.3 | $ 18.6 | $ 12.6 | $ 10.7 | $ 53.6 |

*Mar. 2024 includes $20.0 million amortized deferred revenue, Dec. 2024 includes $40.0 million amortized deferred revenue
**Dec. 2025 includes $45.4 million of amortized deferred revenue

BASIN ELECTRIC
POWER COOPERATIVE
A Touchstone Energy® Cooperative

# Surplus Sales MWh
## (In Thousands of MWhs)



| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual | 501.3 | 485.4 | 471.0 | | | | | | | | | |
| Budget | 452.5 | 365.8 | 353.8 | 224.5 | 185.2 | 488.1 | 542.6 | 634.8 | 577.4 | 392.2 | 365.8 | 527.2 |
| Last Year | 515.8 | 525.5 | 443.8 | 395.5 | 292.2 | 357.0 | 457.3 | 484.7 | 407.5 | 383.5 | 348.6 | 444.9 |

**BASIN ELECTRIC POWER COOPERATIVE**
A Touchstone Energy Cooperative

# Operations Expense
## (In Millions)



| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actual** | $158.1 | $152.1 | $127.8 | | | | | | | | | |
| **Budget** | $174.6 | $151.3 | $141.5 | $123.5 | $123.5 | $132.2 | $148.5 | $145.2 | $134.6 | $138.4 | $146.0 | $166.1 |
| **Last Year** | $185.5 | $124.4 | $123.7 | $106.2 | $109.6 | $113.5 | $134.2 | $121.3 | $116.7 | $121.6 | $130.0 | $159.6 |

BASIN ELECTRIC
POWER COOPERATIVE
A Touchstone Energy® Cooperative

# Maintenance Expense
## (In Millions)



|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actual** | $10.3 | $10.7 | $26.6 |  |  |  |  |  |  |  |  |  |
| **Budget** | $11.4 | $10.6 | $16.7 | $17.3 | $28.3 | $34.0 | $11.3 | $16.2 | $18.3 | $17.0 | $11.6 | $10.0 |
| **Last Year** | $12.3 | $9.5 | $23.1 | $24.9 | $28.5 | $17.9 | $12.8 | $13.5 | $13.7 | $15.5 | $12.5 | $15.8 |

BASIN ELECTRIC POWER COOPERATIVE
A Touchstone Energy® Cooperative

# DGC Net Income (Loss)
## March 2025 YTD Budget to Actual
### (in millions)



Total Variance = +$5.2 million

■ Above Budget  ■ Under Budget

# DGC Net Income (Loss)
## Current Year to Prior Year (YTD)
### (in millions)



# DGC Net Income (Loss)
### (in millions)





Year-To-Date: $(2.4), $(7.6), $(23.7)

|         | Jan   | Feb    | Mar   | Apr   | May   | Jun    | Jul    | Aug    | Sep    | Oct   | Nov   | Dec    | Total   |
|---------|-------|--------|-------|-------|-------|--------|--------|--------|--------|-------|-------|--------|---------|
| Actual    | $ 3.2 | $ (1.3) | $ (4.3) | $  -  | $  -  | $  -   | $  -   | $  -   | $  -   | $  -  | $  -  | $  -   | $ (2.4)  |
| Budget    | $ (1.0) | $ (1.5) | $ (5.0) | $ 9.1 | $ 1.7 | $ (14.1) | $ (11.0) | $ (9.9) | $ (17.9) | $ 2.4 | $ 0.8 | $ (8.8) | $ (55.2) |
| Last Year | $ (13.7) | $ (11.0) | $ 1.1 | $ 6.9 | $ 3.7 | $ (4.4) | $ 2.7 | $ (15.1) | $ (8.0) | $ (0.7) | $ 2.7 | $ 4.5 | $ (31.3) |

# DGC EBITDA
## (in millions)

| EBITDA | | | | | | |
|---|---|---|---|---|---|---|
| | **Month** | | | **Year-To-Date** | | |
| | Actual | Budget | Variance | Actual | Budget | Variance |
| Net Income (Loss) | $ (4.3) | $ (5.0) | $ 0.7 | $ (2.4) | $ (7.6) | $ 5.2 |
| Interest expense | 3.0 | 3.0 | - | 8.7 | 8.7 | - |
| Tax provision (benefit) | 2.3 | (1.3) | 3.6 | 2.7 | (2.0) | 4.7 |
| Depreciation and impairment | 3.3 | 3.1 | 0.2 | 8.3 | 9.4 | (1.1) |
| | $ 4.3 | $ (0.2) | $ 4.5 | $ 17.3 | $ 8.5 | $ 8.8 |

**BASIN ELECTRIC POWER COOPERATIVE**
A Touchstone Energy® Cooperative

# Estimated 45Q Impact

## March 2025 YTD (*Unaudited and Confidential*)
### (in millions)

| 45Q Estimated Impact (YTD thru March) | | | | | Actual $ per ton | Budget $ per ton |
|---|---|---|---|---|---|---|
| | **Actual** | | **Budget** | | **Variance** | |
| Sequestration Volumes (tons) | 357,682 | | 293,591 | | 64,091 | |
| **Operating Revenue:** | | | | | | |
| CO2 Sales | $ 5.5 | $ | 4.5 | $ | 1.0 | |
| CO2 Sequestration Services | 4.4 | | 3.6 | $ | 0.8 | |
| CO2 O&M Services | 4.4 | | 4.3 | $ | 0.1 | |
| Performance Bonus | 5.2 | | 4.0 | $ | 1.2 | |
| Management Fee | 0.3 | | 0.3 | $ | - | |
| Other Income | 6.4 | | 6.3 | | 0.1 | |
| | $ 26.2 | $ | 23.0 | $ | 3.2 | $ 73.43 | $ 78.07 |
| **Operating Expenses:** | | | | | | |
| Utilities | $ 2.6 | $ | 3.1 | $ | (0.5) | |
| Royalties and Leases | 0.4 | | 0.6 | $ | (0.2) | |
| Insurance | 1.0 | | 1.0 | $ | - | |
| Depreciation and Amortization | 0.6 | | 0.7 | $ | (0.1) | |
| Contracted Services | 6.2 | | 4.8 | $ | 1.4 | |
| Other Expense | 0.1 | | - | $ | 0.1 | |
| | $ 10.9 | $ | 10.2 | $ | 0.7 | $ 30.71 | $ 34.93 |
| **Income Before Taxes** | $ 15.3 | $ | 12.8 | $ | 2.5 | $ 42.71 | $ 43.13 |

*Non-GAAP presentation.*

BASIN ELECTRIC
POWER COOPERATIVE
A Touchstone Energy® Cooperative

# Liquidity





# Financing Strategy

- Increase liquidity
  - Heavier usage of Credit Facility

- Access deeper pools of capital
  - First public bond issuance in August-October of 2025
  - 144A with SEC registration rights
  - Taxable issuance & tax-exempt markets
  - RUS NewEra
  - Occasional financing 4(a)2 private placement market

- Create flexibility between different financing options
  - Up-sizing, reopenings, future term loans, & leases



# Cash and Investments

**BASIN ELECTRIC POWER COOPERATIVE**

*Investment Summary*
*As of February 28, 2025*

| | Investments Outstanding | Weighted Avg. Yield (%) | Weighted Avg. Maturity |
|---|---|---|---|
| **Basin Electric Power Coop.** | | | |
| General Fund | $758,210,242.71[3] | 4.215 | 5 Days |
| LRS Operating Fund | $22,000,000.00 | 3.93 | 12 Days |
| Asset Retirement Obligation Fund | $50,689,217.21 | - | - |
| **Dakota Gasification Company** | | | |
| Operating Fund | $63,539,860.40 | 4.09 | 6 Days |
| SVP Escrow Fund | $4,728,560.23[1] | | |
| **Dakota Coal Company** | | | |
| Mine Closing Fund | $111,255,998.85[1] | 13.91[2] | 28 Days |
| **Basin Cooperative Services** | | | |
| Mine Closing Fund | $16,734,191.74[1] | 13.77[2] | 28 Days |
| Operating Fund/Investment | $4,800,000.00 | 4.25 | 73 Days |
| **TOTAL** | $1,031,958,071.14 | 5.18 | 8 Days |

[1] Not included in cash position on the Basin Electric Balance Sheet.
[2] 1-Year total return including dividends, interest, net capital gains and withdrawals.
[3] Does not include accrued interest.



**Basin General Fund (in millions) February 28, 2025**

- BND MMDA — $258.50, 34%
- Managed Accounts — $134.60, 18%
- Bank Group Deposits — $190.10, 25%
- General Fund Investments - Treasuries — $175.0, 23%



# Interest Rates Forecast

### Forecasted Borrowing Rates



### Interest Rate Forecast





# Projected Borrowings



### Anticipated Borrowings

| TOTAL | |
|---|---|
| 1,313 | Amortizing |
| 4,138 | Bullet |
| 3,716 | TBD |
| **9,166** | **Grand Total** |



# Bond Spreads



# Interest Rates & Risk Management

|  | Amount | % of Debt | Weighted Avg Rate |
|---|---|---|---|
| Fixed Rate Debt | $4,673,569,278 | 90.39% | 4.718% |
| Variable LT Debt | $   131,627,021 | 2.55% | 5.791% |
| Variable ST Debt | $   365,199,276 | 7.06% | 4.447% |
| Total | $5,170,395,574 | 100.00% | 4.726% |
| Cash & Investments | $   846,200,706 | 16.37% | 4.206% |

# Cumulative Interest Expense
## (on new borrowings)



# Ratings

**BASIN ELECTRIC LONG-TERM CREDIT RATINGS**

|  |  | TARGET |  | Last Date Affirmed |
|---|---|---|---|---|
| S&P (Stable) | A+ | A | A- | 10/31/2024 |
| Moody's (Positive) | A1 | A2 | A3 | 09/30/2024 |
| Fitch (Stable) | A+ | A | A- | 02/11/2025 |

| = Current Rating

Commentary
- Rating Agency Meetings scheduled for May 6th -7th

Basin Electric Power Cooperative  |  24

**ATTACHMENT 2**

---

**Excerpt from Basin Brief**

Docket Nos. ER20-2441-002, *et al.*
Page 25

costs would not change if FERC ordered a disallowance and refund of up to $465 million.[127] Mr. McCullough projects only a minimal rating reduction and increase in borrowing costs in the event of the proposed $738 million disallowance and refund,[128] which would nearly exhaust Basin Electric's liquidity of $909 million.[129] His projections are inconsistent with his earlier testimony that if Basin Electric had not implemented a 2016 intra-year rate increase (creating an additional $69.4 million in revenue), Basin Electric's Moody's rating would have declined two additional levels, from A3 to Baa.[130]

Mr. McCullough also acknowledged that Moody's considers liquidity, which is "frequently critical to ratings."[131] Yet, he opined that a $465 million refund in the face of liquidity of $909 million would not change the Moody's rating.[132] Accordingly, FERC should disregard Mr. McCullough's testimony as to the effects of a disallowance and refund on Basin Electric's Moody's rating and costs of borrowing.

## C. BANKRUPTCY

Basin Electric could seek federal bankruptcy protection to liquidate under Chapter 7 of the Bankruptcy Code or reorganize under Chapter 11.[133] Therefore, if a refund or disallowance caused Basin Electric to be unable to pay its debts as they came due, Basin

---

[127] MEC-0654 (McCullough Supp. on Fin. Effects) at 6:5-8.

[128] *Id.*

[129] Tr. 10398:8 – 10399:10 (Fontana).

[130] MEC-0246 (McCullough Answering) at 56:6-13.

[131] Tr. 10446:25 – 10447:4 (McCullough); BE-0245 (Moody's Methodology) at 14.

[132] 10449:11 – 10450:5 (McCullough).

[133] *See generally* 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"); *see* 11 U.S.C. § 109(b), (d); 11 U.S.C. § 101(9) and (41).

**ATTACHMENT 3**

---

**Basin Today Article**

# BASIN ELECTRIC HOSTS LENDERS MEETING IN MINNEAPOLIS

07 MAY 2025



*Chris Johnson, Basin Electric's senior vice president and chief financial officer, addresses a group of financial lenders at a meeting on April 7, 2025, in Minneapolis.*

On April 7, 2025, Basin Electric hosted a meeting with financial lenders in Minneapolis, Minnesota, to discuss future capital needs of the cooperative. Around 50 lenders from more than 20 different banks and cooperative lending institutions attended the event.

Basin Electric is in the process of renewing and increasing its revolving credit facility, according to Basin Electric **Vice President and Treasurer Sarah Scherm (https://www.basinelectric.com/about-us/organization/Executives/index)**. The meeting was to

provide an update about Basin Electric to existing and prospective lenders, including information about its capital projects, financial results, future financing plans, and **sustainability report (https://www.basinelectric.com/News-center/publications/Sustainability-Report)**. The banks use the information to determine whether to commit funds toward the new facility, she said.

In general terms, a revolving credit facility is a flexible loan that allows businesses – or in this case cooperatives – to borrow, repay, and re-borrow up to a pre-approved limit. Basin Electric uses its credit facility to support its generation and transmission activities and projects.

Scherm said she deemed the meeting a success. "The information presented in the meeting was very well received," she said. "The lenders are excited about the Basin Electric story and want to be a part of funding our future capital growth."

Basin Electric typically hosts a lender meeting every one to two years, when, Scherm explained, "we gather the banks together and give them an overall company update. We also have individual virtual or in-person meetings with banks throughout the year to provide ongoing updates as needed."

These meetings help reinforce relationships with lenders, something important to Basin Electric and its intended goals, which encompass providing its cooperative members with **safe, reliable, and affordable power (https://www.basinelectric.com/)**.

"Meetings like this are an efficient way to get all of the bankers in a room at the same time so they receive the same information together," Scherm said. "It is a great way for Basin Electric finance staff to network with our lenders and for the lenders to network with each other."

# RELATED POSTS

**2024 Annual Report now available** (2024-Annual-Report-now-available.html)

**Basin Electric and Dakota Gas receive recognition and awards** (../Live-wire-posts/Basin-Electric-and-Dakota-Gas-receive-recognition-and-awards.html)

**Board approves 2025 load forecast** (Board-approves-2025-load-forecast.html)

**Winter weather brought new all-time member billing peak** (Winter-weather-brought-new-all-time-member-billing-peak.html)

## SOCIAL MEDIA

**f**

**(https://www.facebook.com/basinelectric)**

**X**

**(https://x.com/Basin_Electric)**

**in**

**(https://www.linkedin.com/company/basin-electric-power-cooperative/)**

## CATEGORIES

**BASIN TODAY (../BASIN-TODAY.HTML)**                                    **44**

---

**BASIN ELECTRIC: LIVE WIRE (../LIVE-WIRE-BLOG.HTML)**                   **134**

---

**NEWS BRIEFS (../BASIN-UPDATE.HTML)**                                   **199**

---

**NEWS RELEASES (../NEWS-RELEASE.HTML)**                                 **13**

---

**ATTACHMENT 4**

---

**Verification**

**VERIFICATION**

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

EXECUTED on June ___, 2025. 06/10/2025

By: _Matt Hanson_ _____
            Matt Hanson

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon the Corporate Officials of Basin Electric Power Cooperative.

Matthew R. Kolling
Sr. Staff Counsel
Basin Electric Power Cooperative
1717 E. Interstate Avenue
Bismarck, ND 58503
Telephone: (701) 557-5713
Fax: (701) 224-5343
Email: mkolling@bepc.com

DATED: June 10, 2025.

*/s/ Jason Johns*
Jason A. Johns
Stoel Rives LLP

129060030.10 0069518-00014